[Nos. 1978, 1989, 1991]

EUREKA COUNTY BANK HABEAS CORPUS CASES. RE APPLICATIONS OF OSCAR J. SMITH AND W. E. GRIFFIN; OSCAR J. SMITH, W. E. GRIFFIN, H. F. GOLDING, AND C. H. GORMAN; AND JOHN HANCOCK.

1. BANKING BUSINESS—REGULATION — CONSTITUTIONALITY—POLICE POWER.

The legislature may regulate the banking business, and penal statutes safeguarding the business of banking are applicable to banks organized previous to, as well as to banks organized after, their passage.

2. HABEAS CORPUS—DISCHARGE FROM ARREST UNDER WARRANT OR INDICTMENT—EXCESS OF JURISDICTION—CASE NOT ALLOWED BY LAW—WANT OF PROBABLE CAUSE—TAKING EVIDENCE.

Under the clear provisions of the *habeas corpus* act (Rev. Laws, 6239, 6241, 6242, 6243, 6245), directing that the judge before whom a writ of *habeas corpus* is returned, shall "proceed to hear and examine the return, and such other matters as may be properly submitted," and "in a summary way to hear such allegations and proof as may be. produced against such imprisonment or detention, or in favor of the same, and to dispose of such parties as the justice of the case may require"; and that "such judge shall have full power and authority to require and compel the attendance of witnesses by process of subpena and attachment, and to do and perform all other acts and things necessary to a full and fair hearing and determination of the case," and "to discharge such party if no legal cause be shown"; that "if it appears on the return of the writ that the prisoner is in custody by virtue of process from any court * * *, or judge or officer thereof, such prisoner may be discharged, * * * first, when the jurisdiction of such court or officer has been exceeded * * *; fourth, when the process, though proper in form, has been issued in a case not allowed by law * * *; sixth, where a party has been committed on a criminal charge without reasonable or probable cause," the warrant of a committing magistrate and

the bench warrant under · an indictment are not final judg-
ments, nor conclusive, and the judge or court hearing an appli-
cation for a writ of *habeas corpus* may take or hear evidence
against the warrants and indictment, and may discharge the
accused when the magistrate, grand jury or court have
exceeded their jurisdiction, when the process has been issued
in a case not allowed by law, or when the party has been com-
mitted on a criminal charge without reasonable or probable
cause.

3. HABEAS CORPUS—FINAL JUDGMENT OF COMPETENT COURT OF
CRIMINAL JURISDICTION—EVIDENCE—DISCHARGE OF ACCUSED.

The provision in Rev. Laws, 6244, that it shall be the duty
of the "judge to remand the party if it shall appear that he is
detained in custody by virtue of a final judgment or decree of
any competent court of criminal jurisdiction," implies that he
may be discharged in other cases if it appears from the evi-
dence that there is no ground for detaining him. The war-
rant of the committing magistrate and the bench warrants
issued under the indictment are not final judgments, nor con-
clusive under the provisions of the *habeas corpus* act.

4. WANT OF PROBABLE CAUSE—WHEN PERSON BOUND OVER WILL
BE DISCHARGED.

It is a well-recognized rule that a person charged with fel-
ony and bound over by a committing magistrate will be dis-
charged when there is no probable cause for believing that he
is guilty of any offense.

5. INDICTMENT—BENCH WARRANT—WHEN ACCUSED ENTITLED TO
DISCHARGE.

Under the provisions of the *habeas corpus* act, persons held
under an indictment and bench warrant issued under it, are
entitled to be released when it is undisputed and clearly
appears that they have committed no act which the law
declares to be criminal, or if they are held in a case not allowed
by law.

6. CONCLUSIVENESS OF INDICTMENT ON HABEAS CORPUS PROCEED-
INGS—LACK OF EVIDENCE TO SUSTAIN INDICTMENT OR SHOW
GUILT—BURDEN OF SHOWING LACK OF EVIDENCE.

The indictment is strong presumptive evidence of the truth
of the allegations, but it is not conclusive against the objection
that the court is without jurisdiction; and the court may con-
sider the evidence and the real facts, the burden of showing
which, clearly, in order to overcome the indictment, is upon
the petitioners. Unless it appears that no evidence for the
consideration of the trial jury can be supplied, indicating that
the accused committed the crimes for which they are charged,
or if the state can produce any evidence which would support
the material allegations of the indictments and sustain a con-
viction, the indictments would be conclusive to the extent of
requiring remanding to custody of the accused for trial, no
matter how much evidence the accused may have tending to
prove innocence.

7. LACK OF CRIMINAL JURISDICTION IF ACTS DO NOT CONSTITUTE
CRIME.

Acts which the law declares to be criminal are the only ones
which constitute crime, or for which a criminal court has
jurisdiction to try an accused person. Prosecuting officers and
law-abiding citizens cannot properly demand the conviction or
prosecution of persons for the commission of other acts. If
they could, no citizen, not even the law-abiding, would be safe.
The district court is without original jurisdiction of misde-
meanors triable in the justice's court, and the justice's court
is without jurisdiction to try felonies which are triable only
in the district court, and both are without jurisdiction to try
an accused person for acts which are neither felonies nor
misdemeanors, and which do not constitute crime. When a
court attempts to punish for the commission of acts which are
not criminal by law it goes beyond its jurisdiction into the
domain of legislation, which is committed exclusively to
another department of government.

8. GRAND JURY—POWER TO INDICT.

It is the commission of an offense within the county which
gives the grand jury authority to indict. Under Rev. Laws,
7020, "the grand jury must inquire into all public offenses com-
mitted and triable in the jurisdiction of the court." Under
sections 7012 and 7013 the foreman and members of the grand
jury are required to take an oath to present all offenses "com-
mitted and triable within this county of which you shall have
or can obtain legal evidence"; and under section 7026, indict-
ment should be found "when all the evidence * * * taken
together is such as * * * would, if unexplained or uncontra-
dicted, warrant a conviction by the trial jury." Under these
statutory provisions the grand jury has not power to indict
without evidence of the commission of an act constituting a
criminal offense in the county, which would sustain a con-
viction by a trial jury.

9. PENAL LAWS—CERTAINTY.

Criminal laws must be plainly written, so that every per-
son may have an opportunity to know with certainty what
acts or omissions constitute crime.

10. HABEAS CORPUS—WRIT NOT DESIGNED TO INTERFERE WITH JURIS-
DICTION OF COURTS OR MAGISTRATES, OR TO TAKE THE PLACE OF
APPEAL—WHEN WILL ISSUE.

The writ of *habeas corpus* is not designed to interfere with
the jurisdiction of any court, nor with the functions of com-
mitting magistrates or trial judges in determining as to the
guilt of persons charged against whom there is evidence indi-
cating that they have broken the law, nor is it designed to
take the place of an appeal. It will seldom issue, but under
the constitutional provisions guaranteeing liberty to the citizens
and giving the right to the writ, it ought to issue in every
case for the discharge of persons accused when it is clear and
undisputed that the acts for which they are held are not
criminal.

11. DISCHARGE UNDER A WRIT OF HABEAS CORPUS—FAILURE OF STATE TO DENY OR DISPROVE EVIDENCE THAT PETITIONERS WERE NOT IN THE COUNTY AND COMMITTED NO OFFENSE.

When on the hearing of the application for the writ of *habeas corpus* the prosecuting witness testifies that he does not know that certain of the petitioners were in Eureka County, and there is positive evidence on their behalf, uncontradicted, that they were not there, and the attorney for the state declined to make any admission, a failure to deny or offer any testimony against the evidence submitted by the petitioners, or to claim that the state could produce any contrary evidence upon a trial, is equivalent to an admission. In view of this, and other undisputed evidence that the petitioners committed no act which is made criminal and punishable in Eureka County, they are entitled to be restored to liberty under the constitutional right to the writ of *habeas corpus*.

12. LIABILITY OF ABSENT OFFICER OF INCORPORATED BANK RECEIVING DEPOSITS—ASSENT—CONNIVANCE.

Where, under indictments and bench warrants under a statute making it a felony for any officer, director or person to accept or receive a deposit in any bank, when he knows or has good reason to know that the bank is insolvent, or for permitting, conniving at or assenting to the reception of deposits, it is sought to hold and punish directors and officers of a bank who are not residing in the county, and were not at the bank, and did nothing in regard to the receipt of deposits, on the assumption that, because they were such directors and officers, the inference would follow that they were receiving the deposits, assenting to and conniving at the reception of deposits which were being received by the bank through its cashier, they are entitled to be discharged because the statute nowhere by its terms provides any penalty against petitioners or persons for merely acting as directors or officers of a bank, whether solvent or insolvent, or when receiving deposits and insolvent, except officers or persons actually receiving deposits for the bank, knowing or having good reason to know that it is insolvent.

13. RECEIPT OF DEPOSITS BY INCORPORATED BANK—KNOWLEDGE OF INSOLVENCY.

The receipt in a private bank of a deposit by the teller is the receipt by the private banker, because he is the principal, the teller, the agent, and the deposit is the banker's private property; but the receipt of a deposit in an incorporated bank by the teller is a receipt by the corporation and the deposit becomes the property of the incorporated bank, not of the teller or other officers of the bank; and the teller or cashier actually receiving the deposit for an incorporated bank is not guilty of felony unless he knows, or has good reason to know, that the bank is insolvent, and he may not have the same knowledge regarding the value of the assets and the insolvency of the bank as the directors.

14. POWERS OF DIRECTOR OR OFFICER TO CLOSE INCORPORATED BANK.

A director or officer, when he is not specially authorized by the board of directors or stockholders, is not empowered to prevent the reception of deposits or to close a bank which has long been doing business and is receiving deposits, merely because he is such officer.

15. OFFICER WITHOUT POWER TO CLOSE BANK—ASSENT TO DEPOSIT.

Under the provisions of the statute, that any bank officer having authority to close the bank or to prevent the reception of deposits, who does not exercise such authority when he knows the bank to be insolvent, shall be deemed to have assented to the reception of deposits, the officer is not guilty of assenting to the reception of deposits merely because he is such officer, when he has not been authorized to close the bank nor to prevent the reception of deposits, and is absent and does nothing in regard to the deposits. Under the statute, the assenting to the reception of deposits implies the power to withhold assent; and an officer who is without this power, and is absent and does not act in regard to the deposit, cannot be held guilty of assenting to the reception of a deposit.

16. NEW ALLEGATIONS IN NEW INDICTMENTS WITHOUT EVIDENCE; WHEN DO NOT GIVE JURISDICTION.

Bringing new indictments after petitioners have been discharged on *habeas corpus*, and adding or omitting words in the charging part which cannot be supported by any evidence, does not bring the accused within the jurisdiction of the court, if evidence be heard as directed by the statute and the undisputed facts show that petitioners were not within the jurisdiction of the court and committed no act which the legislature has made punishable. Alleging that they received deposits when the evidence is clear that they were not in the county, nor at the bank, does not give the court jurisdiction to try them, when the statute provides no penalty for their acting as directors and officers of the bank, even if it was insolvent, and when the *habeas corpus* act directs that testimony be heard and petitioners discharged if it is sought to hold them in a case not provided by law.

17. SECOND INDICTMENT—PRESUMPTION—PROOF OF LACK OF EVIDENCE TO SUSTAIN ALLEGATION.

The presumption that the allegations of an indictment, and of a second indictment, are correct, in the absence of any testimony, may be overcome by clear proof on the part of the accused, uncontradicted by the state, indicating that there is not evidence to sustain the material allegations.

18. LACK OF EVIDENCE AND JURISDICTION—DISCHARGE BEFORE TRIAL TO PREVENT INJUSTICE.

Although no expense, however great, ought to prevent the trial of persons properly charged, against whom there is evidence to sustain a conviction, if it is clear that there is no evidence to sustain a conviction for any offense within the

jurisdiction of the court, the accused ought to be discharged before trial to prevent injustice, hardship and expense to them and to the county.

19. QUASHING INDICTMENT—LATENT DEFECT.

Upon a motion to quash, a court can go behind an indictment regular upon its face and determine that it is void for any latent defect.

20. QUASHING INDICTMENT FOR LACK OF EVIDENCE OR FOR PREJUDICE.

In extreme cases, when the court can see that the finding of an indictment is based upon such insufficient evidence as to indicate that the indictment resulted from prejudice, or was found in wilful disregard of the rights of the accused, the court should quash the indictment.

21. GENERAL BANKING ACT OF 1909—HOW FAR REPEALED BY GENERAL ACT OF 1911.

The banking act of March 22, 1911, being a general and comprehensive act, working over and covering most of the features of the general banking act of March 24, 1909, and evidently intended as a substitute for it, repeals the provisions of that act by implication, except as specifically continued in force.

22. REPEAL OF PROVISIONS IN BANKING ACT OF 1909 PENALIZING PUBLICATION OF FALSE STATEMENT.

Section 16 of the general banking act of March 22, 1911 (Stats. 1911, p. 297; Rev. Laws, 631), having remodeled and carried over most of the provisions of section 22 of the general banking act of March 24, 1909 (Stats. 1909, p. 257), and having omitted the provision of section 22 making it a felony to publish any false statement of the amount of the assets and liabilities of a banking corporation, and the later act being a general and comprehensive one, working over the provisions of the earlier act, the provision making it a felony to publish such a statement is repealed and no longer in force.

23. LACK OF JURISDICTION TO INDICT UNDER REPEALED STATUTE— RELEASE ON HABEAS CORPUS.

The court is without jurisdiction to hold for trial and convict the accused under the provision of an act which has been repealed, and when held for an act which is no longer criminal they are entitled to be discharged upon *habeas corpus*.

24. SWEARING TO FALSE REPORT, OR OTHER CRIMINAL ACT, WHERE PUNISHABLE.

Knowingly subscribing or swearing to a false report and other acts by an officer, director, proprietor, agent or clerk of a bank are punishable in the county where the report was subscribed or sworn to or the acts committed.

25. ASSISTANCE OF BLIND COMMISSIONER IN DRAWING GRAND JURY— VALIDITY OF INDICTMENT — PRESUMPTION THAT OFFICERS DO DUTY.

The fact that a county commissioner who was blind assisted

in selecting the members of the grand jury is not a ground for setting aside an indictment. As with officers, the presumption is that he did his duty, and, in the absence of any showing to the contrary, it must be assumed that the clerk and judge in drawing and certifying to the grand jury, did theirs.

26. PREJUDICE OF DISTRICT JUDGE—SETTING ASIDE INDICTMENT ON HABEAS CORPUS.

Under the contention that denunciation at a public meeting, in the public press, and in court, of the officers of a bank, by the district judge who ordered and assisted in drawing the members of the grand jury and presided at the time the indictments were found is cause for setting them aside: *Held*, that generally the prejudice of the judge or bias of the grand jury is not ground for setting aside indictments by writ of *habeas corpus*. Whether the bias of a judge may be so extreme in any case as to warrant the setting aside of an indictment or discharge on *habeas corpus* of indicted persons on the theory that the constitution entitles the citizen to release in such a case, not determined.

27. CONSTITUTIONAL QUESTION—WHEN NOT DETERMINED.

It is the rule that constitutional questions will not be determined unless the determination is necessary for the disposition of the case.

28. SETTING ASIDE INDICTMENT—BIAS OF GRAND JUROR.

Under sections 7090 and 7005 of the Revised Laws, the indictment may be set aside by the court in which the defendant is arraigned, upon motion, when the defendant has not been held to answer before the finding of the indictment, on the ground that a state of mind exists upon the part of the grand juror which would prevent him from acting impartially and without prejudice.

ON PETITION FOR REHEARING

29. HABEAS CORPUS—DISCHARGE—REHEARING.

After an order in a *habeas corpus* proceeding discharging the prisoner, a rehearing will not be granted, since this would suspend the former order and result in the rearrest of the prisoner, contrary to the express provisions of the *habeas corpus* act, sec. 29 (Rev. Laws, 6254).

Syllabus by TALBOT, J.

ORIGINAL PROCEEDING for a writ of *habeas corpus*. **Petitioners discharged.** Petition for rehearing. **Denied.**

The facts sufficiently appear in the opinion.

*James Glynn* and *Oscar J. Smith*, for Petitioners:

Petitioners contend that when the jurisdiction of a court is made to depend upon the existence of certain

facts, those facts are conditions precedent, and the existence or nonexistence of such facts is always open to inquiry, and that upon a *habeas corpus* all matters pertaining to jurisdiction are proper subjects of inquiry, to be heard and determined from the evidence; and that any fact touching the jurisdiction may be given in evidence. (12 Ency. Pl. & Pr. 120; *Paul* v. *Armstrong*, 1 Nev. 82.)

In the cases at bar the power of Justice Cromer flows from the provisions of these banking acts, and is dependent upon the existence of the conditions precedent laid down in these acts, and if the conditions did not in fact exist at the time the *corpus delicti* is charged, Cromer was without jurisdiction to issue the warrants, his general statutory jurisdiction over the subject-matter of crimes being insufficient. Courts have, almost invariably, gone behind records, commitments, warrants, indictments, and complaints in *habeas corpus* proceedings to inquire into the question of jurisdiction when such jurisdiction was challenged.

The prisoner has the undoubted right to show that the magistrate acted without authority; and, this is so, notwithstanding the commitment recites the existence of the necessary facts to give jurisdiction. No court or officer can acquire jurisdiction by the mere assertion of it, or by falsely alleging the existence of facts on which jurisdiction depends. (*People* v. *Cassels*, 5 Hill, 164, 168.)

One arrested under warrant from a magistrate is not obliged to await an examination by the magistrate before suing out a writ of *habeas corpus* to secure his release. (*People, ex rel. Perkins*, v. *Moss*, 187 N. Y. 410, 80 N. E. 363, 11 L. R. A., N. S., 528; *In re Waterman*, 29 Nev. 288, 292, 293; *Ex Parte Rickelt*, 61 Fed. 203, 205.)

The writ is to remove illegal restraints of every kind. (15 Ency. Law, 160.)

Evidence may be received to show the want of probable cause. (9 Ency. Pl. & Pr. 1053.) See, also, sections 3756, 3762, Comp. Laws.

Evidence touching prisoner's guilt will sometimes be received.    (9 Ency. Pl. & Pr. 1053.)

If the averments of the return are traversed, an issue of facts is formed and upon this issue a trial must be had, the facts determined, and the law applied.   (Id. 1052.)

· Matters affecting jurisdiction may be examined.    (Id. 1060.)

It has never been doubted that the fact of jurisdiction was a proper subject for inquiry in a proceeding of this character, and if such were not the case the simple warrant of a court, however arbitrary and illegal it might be, would constitute a complete answer to the writ.   (*In re Corryell*, 22 Cal. 179, 181; *People* v. *Cassels*, 5 Hill, 164, 168; *People, ex rel. Frey*, v. *Warden*, 100 N. Y. 20, 24.) See, also, notes to *Commonwealth* v. *Lecky*, 1 Watts, 66 (Pa.), 26 Am. Dec. 40, 41.

Jurisdictional facts may be established by evidence *aliunde*.   (*Ex Parte Kearny*, 55 Cal. 212, 220; *In re Bogart*, 2 Sawy. 296, 401; Brown on Jurisdiction, 54, 280, 293.)

Petitioners challenge the constitutionality of the act of March 13, 1909.   It is argued by respondent's attorneys that the supreme court of this state has upheld the constitutionality of the act of March 26, 1907 (Stats. 1907, p. 229), containing similar provisions, and hence that this act of March 24, 1909, is also constitutional; but an examination of the act of March 26, 1907, will show that it provides for a due process of law and is not open to the same objections as this act of March 24, 1909.

The Marymont case holds that the legislature cannot exercise unrestricted powers in dealing with banks.

Have directors power to close a bank without special authority from the stockholders?  We insist that the directors have no such power as a board or otherwise unless specifically authorized by the stockholders, and if any such power exists it is implied in a civil statute and cannot be invoked to aid the state in a penal law.

*Cleveland H. Baker*, Attorney-General, *T. J. McParlin*,

District Attorney of Eureka County, *Lewers & Henderson*, and *Mack, Green, Brown & Heer*, for Respondent:

There is nothing in the banking acts which makes any fact a condition precedent to the jurisdiction of the justice to entertain a complaint which will authorize the justice to issue his warrant, cause the accused to be brought before him, and make inquiry as to the grounds for believing that the accused is guilty of a violation of the statutes.

The conditions precedent to the jurisdiction of Justice Cromer to issue his warrant of arrest were the same in these cases as in all other cases where felony is charged: First, he must have been a magistrate; second, a complaint by proper affidavit setting forth the nature of the charge, etc., must have been filed with him and from said complaint it must have sufficiently appeared that an offense had been committed by some person, triable within his county. (Comp. Laws, 4073; *Sheldon's Lessees* v. *Norton*, 30 Ohio St. 499; *U. S.* v. *Arreondo*, 31 U. S. 691, 709; Freeman on Judgments, sec. 118; *Belles* v. *Miller*, 38 Pac. 1050–1052.)

The charge made, whether by complaint, information or indictment, gives jurisdiction. (*People* v. *Fahey*, 30 Pac. 1030; *Ex Parte Bell*, 34 Pac. 641; *State* v. *Evans*, 60 N. W. 433, 434.)

The filing of a proper complaint with the magistrate is the condition precedent to his jurisdiction to issue a warrant. (*In re Eldred*, 1 N. W. 175, 176; *Pardee* v. *Smith*, 27 Mich. 33, 42, 43; *State* v. *Carey*, 42 Pac. 371, 372; *State* v. *Stobie*, 92 S. W. 191, 196, 203; *Phillips* v. *Welch*, 12 Nev. 158.)

That the writ is used "to remove illegal restraints of every kind" is true. But the legality of the restraint does not depend on the guilt or innocence of the prisoner. Otherwise, every man found innocent by a jury would have been illegally restrained of his liberty and be entitled to maintain an action for false imprisonment.

"Evidence may be received to show the want of probable cause." That is true only after preliminary examina-

tion and commitment, such evidence in this state being confined to the depositions taken on the preliminary examination by the committing magistrate. (*Ex Parte Allen,* 12 Nev. 87.)

None of the other citations from the Encyclopedia of Pleading and Practice, nor those from Brown on Jurisdiction, when read in connection with the context and the authorities cited in support of the text, will sustain the contention of petitioners that on the hearing of the returns to the writs they are entitled to offer evidence concerning the merits of the charges on which they have been arrested. (*Ex Parte Mahone,* 30 Ala. 49, 50; *Ex Parte Shandies,* 66 Ala. 137.)

It seems to be petitioners' theory that a banker who knows that his bank is insolvent and therefore an unsafe place for a depositor's money, is entitled nevertheless to continue to hold himself out as solvent and to receive deposits, and that such act of reception creates only debts, and that statutes making the reception of deposits under such circumstances crimes, punishable by imprisonment, provide for imprisonment for debt and abridge the immunities of bankers. *Ex Parte Pittman,* 31 Nev. 43, is a complete answer to counsel's contention on these points.

Petitioners also contend that this act of March 13, 1909, established a system of vicarious punishment and makes one man suffer for the offenses of another and thereby denies the equal protection of the laws, overlooking the fact that the bank officer, who is punished for assenting to the reception of a deposit in an insolvent bank, is not punished for the act of the employee receiving the deposit, but for his own failure to exercise his duty to prevent the reception of the deposit when he knows the bank is insolvent.

The only way by which directors as such may exercise their authority to close the bank or prevent the reception of deposits, is by voting at a meeting of the stockholders that the bank shall be closed, or that no more deposits shall be received therein. Hence a director

who so votes does not fail to exercise such authority as he possesses. The case of a director who by resolution of the board, or by the by-laws of the corporation, was given special authority or made the general manager of the affairs of the bank would stand upon a different footing.

The question, in any particular case, as to whether or not an officer or director did have authority to close the bank and prevent the reception of deposits therein, is an ultimate question of fact, and the allegation that an officer did have such authority is an allegation of ultimate fact, the truth or falsity of which would depend upon the evidence adduced to prove the existence of such authority. That evidence would vary with the particular circumstances of the case.

In asserting that there is no authority anywhere except in the stockholders to close a bank or prevent the reception of deposits, when it is in failing circumstances, the petitioners ungratefully turn their backs upon the reasoning of the supreme court of this state in *Ex Parte Smith*, 111 Pac. 930.

Counsel for petitioners would have the court think, that on a prosecution under the act of March 13, 1909, the question of whether or not the bank was insolvent or in failing circumstances would be dependent upon the action of the bank examiner and the state banking board. But the question as to whether or not the bank was insolvent would in such a case be a question of fact to be determined by the evidence adduced on the trial.

Corporations are subject to the police powers of the state as to regulation and control in the interest of the public. (Tiedman on Limitation of Police Powers, 576; *Chicago Life Insurance Company* v. *Needles*, 28 L. Ed. 574; *Venner* v. *Chicago Electric Ry. Co.*, 92 N. W. 646; *Commonwealth* v. *Bank*, 32 Am. Dec. 290.) The banking act of March 24, 1909, clearly indicates that that act is a general act for the alteration of the charters of all banking corporations theretofore organized. This is a valid exercise of the powers reserved by the constitution.

(*Miller* v. *State,* 15 Wall. 478; 21 L. Ed. 98; *Spring Valley Water Works* v. *Schottler,* 110 U. S. 347, 28 L. Ed. 173; *Noble State Bank* v. *Haskell,* 91 Pac. 591.)

We maintain that the constitutionality of these statutes is really immaterial to a decision of the question before the court. If the respondent arrested the petitioners under and by virtue of one valid warrant, it is immaterial whether or not his other warrants are valid. (*Ex Parte Ryan,* 10 Nev. 261; *Ex Parte Ryan,* 17 Nev. 139.)

The complaint of A. C. Florio charging the petitioners here with accepting deposits in an insolvent banking institution when the petitioners, being officers of the bank, knew said bank to be insolvent, is a good complaint charging the offense described in the act approved March 29, 1907. (Stats. 1907, p. 414.) It is true it does not denominate the offense as "embezzlement," but since it states all the facts constituting the crime which that statute calls embezzlement, it is sufficient. (*State* v. *Anderson,* 3 Nev. 254; *State* v. *Johnson,* 9 Nev. 175; *State* v. *Angelo,* 18 Nev. 425; Comp. Laws, 4200; 10 Ency. Pl. & Pr. 480.)

Upon the oral argument we said that, in order to discharge the petitioners, the court must declare three acts unconstitutional; the two of 1909 and that of March 29, 1907, and that the act of 1907 had already been declared constitutional by the supreme court of this state. (*Ex Parte Pittman,* 31 Nev. 44.)

We respectfully submit that in these proceedings the sole duty of the court is to order the petitioners remanded to the custody of the sheriff of Eureka County.

*Per Curiam:*

Delay in the determination of this case is regretted; but as the members of the court have been occupied with matters of greater public concern, and the petitioners have been at liberty on bail, it has been deemed best to wait until careful consideration could be given to the numerous important questions involved. An examination of decisions relating to *habeas corpus* indicates that

many of them have been rendered hurriedly and without taking time for careful consideration of the reasons and statutes that ought to control.

The petitioners Oscar J. Smith and W. E. Griffin were arrested in Washoe County by the sheriff of Eureka County, under warrants of arrest issued by the justice of the peace at Eureka, charging the commission of felonies in Eureka County. Smith and Griffin applied to District Judge Moran, in Washoe County, for writs of *habeas corpus,* and were by him admitted to bail pending the determination of their applications. Thereafter, and before any final decision had been rendered by the district judge, they filed with the clerk of the district court purported written dismissals of their petitions for writ of *habeas corpus,* and under an order of their bail for their arrest surrendered themselves to the bailiff of the supreme court and applied for writs of *habeas corpus* before this tribunal, and obtained here an alternative order temporarily restraining the district court from deciding the cases brought before it and sought to be dismissed.

Three complaints and three warrants of arrest accompanying them, issued by the justice of the peace of Eureka township, in the county of Eureka, charged, respectively, the commission in that county of the crimes of felonious receipt of money on deposit in an insolvent banking corporation, the felonious assenting to the reception of deposits in an insolvent banking corporation by the directors of such bank while having knowledge of its insolvency, and the felonious subscribing to false papers, with intent to deceive the bank examiner. Later Oscar J. Smith, W. E. Griffin, H. F. Golding, and C. H. Gorman were arrested in Washoe County, and John Hancock, Sr., in Esmeralda County, all by the superintendent of the state police and officers acting under him, on bench warrants issued under the following indictments found by the grand jury of Eureka County, charging offenses alleged to have been committed in that county as follows:

Against Oscar J. Smith, W. E. Griffin, and H. F. Gold-

ing for publishing false statement on July 31, 1909, under act of 1909; against Oscar J. Smith, W. E. Griffin, and C. H. Gorman, for publishing false statement on December 4, 1909, under act of 1909; against Oscar J. Smith, W. E. Griffin, and C. H. Gorman for publishing false statement February 6, 1910, under act of 1909; against Oscar J. Smith, Bert L. Smith, W. E. Griffin, John Hancock, Sr., and H. F. Golding for acceptance of checks, to wit, money on deposit, without interest, November 8, 1909; against Oscar J. Smith, Bert L. Smith, W. E. Griffin, John Hancock, Sr., and C. H. Gorman for acceptance of checks, to wit, money on deposit, without interest, March 14, 1910; against Oscar J. Smith, Bert L. Smith, W. E. Griffin, John Hancock, Sr., and C. H. Gorman for acceptance of certain checks, to wit, money on deposit, without interest, March 8, 1910; against Oscar J. Smith, Bert L. Smith, W. E. Griffin, John Hancock, Sr., and C. H. Gorman for acceptance of certain checks, to wit, money on deposit, March 15, 1910; against Oscar J. Smith, Bert L. Smith, W. E. Griffin, and John Hancock, Sr., for conniving at the reception of deposits, to wit, certain checks or money in an insolvent incorporated bank, by the directors thereof, March 21, 1910; against Oscar J. Smith, Bert L. Smith, W. E. Griffin, and John Hancock, Sr., for assent to the reception of deposit in an insolvent incorporated bank, by the directors thereof, March 19, 1910; and against C. H. Gorman for acceptance of money, to wit, check on deposit, without interest, March 21, 1910.

On behalf of petitioners Smith and Griffin, it is claimed that the purported dismissals filed by them in the district court, and their arrest and detention by the bailiff of the supreme court under the order of their bail, operated to place them under arrest by virtue of the original arrests made in Reno by the sheriff of Eureka County under the warrants issued by the justice of the peace. They allege that the arrests under the warrants issued by the committing magistrate were illegal, for the following reasons: That the justice of the peace of Eureka township had no jurisdiction to issue the warrants, because petitioners

were not in, nor within fifty miles of, the boundaries of Eureka County at any of the times mentioned in the complaints upon which the warrants purport to be based, or within sixty days prior to or since any of said times. "And petitioners further allege that the courts of Eureka County, Nevada, are without jurisdiction or power to try or examine or determine the offenses alleged or attempted to be alleged or charged or stated in any of the pretended warrants or complaints; * * * and, further, because the petitioners, or either of them, had no authority at any time to close the Eureka County Bank named in the complaint upon which the warrants were issued; and for the further reason that the pretended offenses attempted to be set forth in said pretended complaint and warrants were not triable in said county of Eureka"; that the banking corporation mentioned was closed, by order of the Nevada State Banking Board, on the 22d day of March, 1910, and that such closing was without due process of law, and without any authority or right whatever, by reason of the fact that the act of the legislature of the State of Nevada under which said board pretended to act (Stats. 1908–09, pp. 251–267) is unconstitutional, null and void, "because the Eureka County Bank is a corporation duly organized and existing under an act of the legislature of the State of Nevada entitled 'An act to provide for the formation of corporations for certain purposes,' approved March 10, 1865 (Stats. 1865, c. 111)," and petitioners deny the right of the legislature to bring the said Eureka County Bank within the terms of an act entitled "An act to define and regulate the business of banking, creating and providing for a bank examiner and the examination and supervision of banking corporations, and for the appointment of receivers in certain cases, fixing the penalties for the violation thereof, and other matters relating thereto," approved March 24, 1909; "that if the above-mentioned pretended offense was at all committed the same is not triable in said county of Eureka."

They further deny "that they, or either of them, in any manner received the deposit mentioned in the pretended

complaint of Florio (Exhibit B) on the date named in said pretended complaint, or on any other date, or otherwise, or at all, and deny that they, or either of them, in any manner, or at all, assented to the reception of the deposit mentioned in said pretended complaint of Florio, or of the deposit mentioned in the pretended complaint of Hintze (Exhibit D), in or by said bank mentioned in said pretended complaints, or in or by any bank in said Eureka County or elsewhere, and further deny that said bank was insolvent at any of the times named in said complaints, or at any time prior thereto, and deny that petitioners, or either of them, had knowledge of such insolvency; and petitioners allege that neither of them has any knowledge whatever that any such deposits, as mentioned in said pretended complaints, were ever received by or in said bank."

They allege that the offenses attempted to be charged in two of the complaints (Exhibits B and D) are based upon the act of the legislature entitled "An act making it a felony for any banker, or any officer, director, cashier, teller, managing member, manager, clerk, person, party or agent of any bank, banking corporation, association, firm or person engaged in banking, brokerage, exchange or deposit business to receive, or accept or assent or be accessory to or permit the reception of deposits of money, currency or valuable paper, in banking and other institutions, knowing the same to be insolvent; providing a punishment therefor and establishing a rule of evidence in connection therewith," approved March 13, 1909 (Stats. 1909, c. 92). They assert that the act is null and void, for the reason that it is impossible to give it any precise and intelligible meaning or application in the circumstances under which it was apparently intended to operate; and that, having no judicial certainty as to its meaning, being penal in its operation, courts are not at liberty to supply any deficiency necessary to make the statute certain.

They further allege that this act is in contravention of the provisions of the fourteenth amendment to the con-

stitution of the United States, that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property without due process of law, nor deny any person within its jurisdiction the equal protection of the laws," for the reason that it seeks to enforce a system of vicarious punishment, and to make one man suffer for the offenses of another, thereby denying the equal protection of the laws; and for the further reason that it permits directors of a bank to evade the penalties of the act, and does not extend the same privilege to a cashier, teller, managing member, manager, clerk, person, party or agent, or any officer of a bank as mentioned in said act, other than a director.

They further allege that this act is in contravention of the sixth amendment to the constitution of the United States, which provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him"— for the reason that said act denies the right to be confronted by witnesses; and, further, in this: That it prescribes a rule of evidence conclusively establishing guilt.

They further allege that the general banking act defining and regulating the business of banking, approved March 24, 1909, is in contravention of other sections of the federal and state constitutions. If the provisions of this act on which a part of the charges against petitioners are based are repealed, as hereafter explained, by reference to the general banking act as passed in 1911, it is unnecessary to consider any objections to it based on constitutional grounds.

It is also claimed that petitioners committed no acts which the law makes criminal or over which the court

in Eureka County has jurisdiction; that part of the petitioners were not in Eureka County at the time they are alleged to have committed the acts charged in the complaints and indictments; and that they ought to be discharged from the indictments because of the prejudice and conduct of the district judge, who, with a blind commissioner, selected the grand jury. Evidence in support of these contentions was admitted on the hearing in this court, subject to objection and the claim by the state that the indictments are conclusive, and that testimony is inadmissible to show that the petitioners were not in Eureka County, or that any acts committed by them did not constitute an offense within the jurisdiction of the court in that county.

Past decisions appear to be decisive of the objection on constitutional grounds to the penal statute relating to the receipt of deposits.

In *State, ex rel. Sparks*, v. *State Bank and Trust Co.*, 31 Nev. 456; *Ex Parte Pittman*, 31 Nev. 43, 22 L. R. A. (N. S.) 266, 20 Ann. Cas. 1319, and *Ex Parte Rickey*, 31 Nev. 104–105, 135 Am. St. Rep. 651, we held that the legislature could regulate the banking business.

In *Marymont* v. *Banking Board*, 33 Nev. 340, we held that the legislature might regulate, but could not prevent persons from engaging in, the banking business, while allowing that right to corporations.

In *Noble State Bank* v. *Haskell*, 219 U. S. 111, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1061, Ann. Cas. 1912A, 447, it was held that the levying and collection from banks existing under state laws of an assessment based upon daily average deposits, for the purpose of creating a depositors' guaranty fund for the purpose of securing the full payment of deposits in case any such bank becomes insolvent, it is a valid exercise of the police power. In that case the Supreme Court of the United States, considering provisions of the federal constitution which, it was claimed, restricted the power of the state or the legislature, Judge Peckham writing the decision, said: "We are of opinion that it may go on from regula-

tion to prohibition, except upon such conditions as it may prescribe."

Whether the legislature may entirely prohibit the banking business was not a question before the court in that case, and to this extent the language may be considered obiter. The court said that objections under the state constitution were not open there. Whether that eminent tribunal, or any court, would hold that the legislature may entirely prohibit the banking business, because it is of such public concern that it is subject to regulation, it is not necessary to consider, any more than it would be to determine whether the legislature may prohibit the sale of groceries and drugs, because laws are properly enacted requiring the purity of these articles, or to prohibit the transportation and manufacturing businesses, because laws are properly enacted regulating and safeguarding these under the police power.

So far as the matter need be considered here, these decisions have properly determined that the banking business may be regulated; and a bank is not exempt from such regulation as that attacked here, because the bank was incorporated prior to the enactment of the legislation providing for the regulation or creating penalties. By the enactment long ago of incorporation or other laws the legislature did not deprive itself of the power to pass laws later, under the police power, for the welfare of the state and her people.

In *Wallace* v. *Reno*, 27 Nev. 81, 73 Pac. 531, 63 L. R. A. 337, 103 Am. St. Rep. 747, quoting from *Beer Company* v. *Massachusetts*, 97 U. S. 25, 24 L. Ed. 989, we said: "Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizen and to the preservation of good order and the public morals. The legislature cannot, by any contract, divest itself of the power to provide for these objects. They belong emphatically to that class of objects which demand

the application of the maxim, '*Salus populi suprema est lex,*' and they are to be attained and provided for by such appropriate means as the legislative discretion may devise. That discretion may no more be bargained away than the power itself."

It is urged by respondent that this court cannot properly admit or consider the testimony admitted, subject to objection on the hearing in this court. There are many varying cases relating to the rights of the citizen to be discharged upon *habeas corpus*. This may be due largely to the difference of the statutes upon which the opinions are based, and, further, in part, to the need of having decisions rendered promptly, if the petitioner remains under arrest, and without always giving time for the most mature deliberation. Decisions in other states, which are without such statutory provisions as we have, relating to the taking of testimony and the discharge of accused persons upon *habeas corpus,* cannot be considered as applicable, or as having the force of repealing these clear and just requirements passed at the legislative session of 1862, prior to the adoption of the constitution, and impliedly sanctioned by that instrument. The clear provisions of our statute direct that the judge before whom a writ of *habeas corpus* is returned shall "proceed to hear and examine the return," and "in a summary way to hear such allegation and proof as may be produced against such imprisonment or detention or in favor of the same and to dispose of such party as the justice of the case may require," and that "such judge shall have full power and authority to require and compel the attendance of witnesses by process of subpena and attachment, and to do and perform all other acts and things necessary to a full and fair hearing and determination of the case." (Rev. Laws, 6239, 6240, 6242.)

The provision that it is the duty of the "judge to remand the party if it shall appear that he is detained in custody by virtue of the final judgment or decree of any competent court of criminal jurisdiction or of any pro-

cess issued upon such judgment or decree or in cases of contempt of court" implies that he may be discharged in other cases, if it appears from the evidence that there is not ground for detaining him.    (Rev. Laws, 6244.)

We are unaware of any language that can more clearly authorize the discharge of petitioners from custody, when held under judicial process not final, or, if final, when issued by a court without jurisdiction, than the provision in the next section of our *habeas corpus* act that, "if it appears on the return of the writ that the prisoner is in custody by virtue of process from any court or judge or officer thereof, such prisoner may be discharged,   *   *   * first, when the jurisdiction of such court or officer has been exceeded.   *   *   *   Fourth, when the process, though proper in form, has been issued in a case not allowed by law.   *   *   *   Sixth, where a party has been committed on a criminal charge without reasonable or probable cause."

The next section provides that no person shall be discharged from custody by reason of defect of form of any warrant or commitment of a justice of the peace.    The next section provides: "If it shall appear to the judge, by affidavit, or upon hearing of the matter, or otherwise, or upon the inspection of the process or warrant of commitment, and such other papers in the proceedings as may be shown to such judge, that the party is guilty of a criminal offense, or ought not to be discharged, such judge, although the charge be defectively or unsubstantially set forth in such process or warrant of commitment, shall cause the complainant, or other necessary witnesses, to be subpenaed to attend at such time as shall be ordered, to testify before such judge; and upon the examination, he shall discharge such prisoner, let him to bail, if the offense be bailable, or recommit him to custody, as may be just and legal." (Rev. Laws, 6247.)

The taking of testimony is directed; and the clear intention of these provisions is that the guilty shall not escape by reason of defect of form, and that persons held under arrest without reasonable or probable cause, or in cases

not allowed by law, shall be discharged, notwithstanding they are held under process in due form issued before final judgment.

As we have heretofore held, acts which the law declares to be criminal are the only ones which constitute crime, or for which a criminal court has jurisdiction to try an accused person. The feeling of persons, one or more, in any community, however sincerely believing themselves to have been wronged, and the zeal or desire to convict of prosecuting or other officers, or of special counsel employed, or the indictment of a grand jury, which is in its nature a criminal complaint, cannot make any person guilty of a felony for the commission of an act which the law does not make criminal. Under the provision of the constitution prohibiting *ex post facto* laws and granting to all persons the equal protection of the law, the legislature itself cannot make any act punishable which was not so by law at the time it was committed.

However earnestly the depositors of the closed bank who lose a portion of their money may feel aggrieved, and however much they and the stockholders who lose all of theirs may be entitled to sympathy, their desire, or the desire of their friends or sympathizers, to punish cannot authorize punishment or prosecution further than the law itself provides. Any other rule would be dangerous, and would lead to the overthrow of the law, or to its supplanting by the desires for revenge or will of persons aggrieved, and to uncertainty and chaos in the administration of justice. Courts, district attorneys, and law-abiding citizens cannot properly demand that any person be punished or prosecuted for any act which is not made criminal by law. When a court attempts to punish for the commission of acts which are not made criminal by law, it goes beyond its jurisdiction into the domain of legislation, which is committed exclusively to another department of government.

Among the paragraphs treating this subject, in *Ex Parte Rickey*, 31 Nev. 89, 135 Am. St. Rep. 651, is the following: "As was said in *Re Corryell*, 22 Cal. 178,

quoted in *Ex Parte Kearny*, 55 Cal. 229: 'The court derives its jurisdiction from the law, and its jurisdiction extends to such matters as the law declares criminal, and none other; and, when it undertakes to imprison for an offense to which no criminality is attached, it acts beyond its jurisdiction.' * * * 'If it appears by the return of the writ that the party be wrongfully committed * * * for a cause for which no man ought to be imprisoned he should be discharged or bailed.'"

In the same case, at page 102 of 31 Nev. (135 Am. St. Rep. 651), quoting from the opinion in *Ex Parte Deidesheimer*, 14 Nev. 311, we said: "Penal laws generally prescribe what shall or shall not be done, and then declare the consequences of a violation of either requirement. They should be plainly written, so that every person may know with certainty what acts or omissions constitute the crime. (Bishop on Stat. Crimes, 193; Beccaria on Crimes, 22, 45; *The Schooner Enterprise*, 1 Paine, 33, Fed. Cas. No. 4499.) * * * And in *United States* v. *Wiltberger*, 5 Wheat. 76, 5 L. Ed. 37 (opinion by Chief Justice Marshall), the court says: 'It has been said that, although penal laws are to be construed strictly, the intention of the legislature must govern in their construction; that if a case be within the intention, it must be considered within the letter of the statute. The rule that penal laws are to be construed strictly is, perhaps, not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals, and on the plain principle that the power of punishment is vested in the legislative, not in the judicial, department. It is the legislature, not the court, which is to define a crime and ordain a punishment. * * * The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one, indeed, which would justify a court in departing from the plain meaning of the words, especially in a penal act, in search of an intention which the words themselves do not suggest. To determine that a case is

within the intention of a statute, its language must authorize us to say so.' See, also, Sedgwick on the Construction of Stat. & Const. Law, 279, *et seq.*; Smith's Commentaries, 746; Bishop on Stat. Crimes, 192, *et seq.* Considering the construction of a penal statute in the case of *State* v. *Wheeler*, 23 Nev. 143, 152, the court said: 'Being penal, the provision exempting persons from the operation of the law should, on the other hand, receive a liberal interpretation.' Mr. Bishop states the rule thus: 'While the parts of a penal statute which subject to punishment or a penalty are, from their odious nature, to be construed strictly, those which exempt from penal consequences will, because of their opposite character, receive a liberal interpretation.' (Bishop, Writ. Laws, 196, 226.) To the same effect are Sutherland, Stat. Const. 227; Endlich, Stat. Int. 332."

We again affirmed these long and well-established principles in *Ex Parte Smith*, 33 Nev. 482.

The committing magistrate and grand jury at Eureka had complete jurisdiction over all felonies committed in that county; and it is not the purpose of the writ of *habeas corpus* to determine in advance of trial whether a felony has been committed there, if the prosecuting officers of the state bona fide claim and have evidence to show that a crime has been committed in that county. If there were any probable cause or any evidence which would indicate the commission of a crime, any on which the petitioners might be tried and on which a trial jury might act, and which would support a verdict of guilty, it would be proper to dismiss these writs and have the petitioners remanded for trial. It is well settled that the writ is not designed to take the place of an appeal. The purpose of the writ is not to interfere with the jurisdiction of any court, nor with the functions of trial judges in determining as to the guilt of persons charged, against whom there is evidence indicating that they have broken the law. It will seldom issue; but it will issue, and ought to issue, in every case for the discharge of persons accused of crime, when it is clear or undis-

puted that the acts for which they are held are not such as are made criminal.

It is the commission of an offense which gives the grand jury authority to indict. If no offense has been committed, then there exists no foundation for an indictment. An indictment has no greater sanctity than that given by the statutes. Power to find an indictment rests primarily upon the determination that an offense has been committed. We see no difference, in legal effect, between an indictment which fails to charge a public offense and an indictment which charges a public offense, without facts constituting such offense to support it, with the exception that in the former case the want of jurisdiction is apparent upon the face of the indictment. Suppose, for example, A. is indicted in Elko County for the murder of B. by shooting him with a pistol on the 1st day of January, 1912. Upon such indictment, A. is subsequently arrested in the county of Washoe upon a bench warrant issued upon the indictment. Suppose A. is prepared to show that he was not in the county of Elko at the time of the alleged homicide, and, further, that B. was not only not killed, but was alive at the time of the arrest, and suppose that this showing is not controverted by the state. Is A. not entitled to be discharged on *habeas corpus,* upon the ground that the grand jury of Elko County had no jurisdiction to find the indictment, because no offense, such as charged in the indictment, was ever committed? We think he would be.

Take the case of Buckaroo Jack, 30 Nev. 325. The defendant, an Indian, was indicted and convicted of the murder of another Indian. The indictment did not allege that the defendant, nor the person killed, was an Indian; but the proof showed that both were Indians and wards of the government. Had the homicide occurred on an Indian reservation, the state courts would not have had jurisdiction. It was contended in that case that the indictment did not show jurisdiction in the trial court, for the reason that it did not negative the federal jurisdiction. We held that it was not necessary that the indictment

negative the federal jurisdiction, for the reason that, the state jurisdiction being general, and the federal jurisdiction being special and limited, such negation was not required, citing a number of cases supporting the doctrine. The evidence in the case showed that the murder was not committed upon a reservation; and hence the state courts had jurisdiction to indict and punish. But, suppose the offense in fact had been committed upon an Indian reservation, the indictment, upon its face, under the authorities cited, would have been sufficient, although in fact the court neither had jurisdiction of the person of the defendant, nor of the subject-matter charged in the indictment. Could not the defendant, on *habeas corpus*, have shown the want of jurisdiction and have been discharged? Manifestly he could have been, without waiting for the delay and expense of a trial.

In these views expressed, we do not fail to appreciate the function of a grand jury or the limitations of a hearing upon *habeas corpus*. If a grand jury has evidence before it which, if true, shows that an offense has been committed, and evidence which, if unexplained or uncontradicted, shows that a certain person has committed the offense, it is its duty to indict. Upon *habeas corpus*, the judge or court cannot determine disputed questions of fact, for the purpose of determining whether an offense has been committed, or whether the defendant is guilty thereof. But if from the showing made on *habeas corpus* it appears, without substantial contradiction, that no offense has been committed, or, if committed, the defendant clearly is not guilty thereof, a showing has been made establishing want of jurisdiction to find the indictment. The power of the state to prosecute cannot be made an engine of persecution. The state, in good faith, is bound to be just to a person charged with crime; and if on *habeas corpus* it fails to combat a clear showing that the grand jury could have had before it no evidence upon which a jury might be justified in finding a verdict of conviction, then the petitioner ought to be discharged. This view does not invade the province of the trial jury,

for upon *habeas corpus* the judge or court cannot determine in regard to a substantial conflict in the evidence, which is the exclusive function of the trial jury; but it can inquire whether any substantial evidence exists which, if true, would support a verdict of conviction, for if there is none the grand jury has exceeded its powers, and the indictment is void.

It is said in 12 Cyc. p. 196, that "criminal jurisdiction is the power and authority constitutionally conferred upon a court, judge, or magistrate to take cognizance of an offense and to pronounce the judgment or sentence provided by law, after a trial in the manner sanctioned by law as proper and sufficient."

"All public offenses triable in the district courts must be prosecuted by indictment." (Rev. Laws, 6999.)

Under chapter 7 of the criminal practice act, "Of the Local Jurisdiction of Public Offenses," it is provided: "Every person * * * is liable to punishment by the laws of this state for a public offense committed by him therein. * * *" (Rev. Laws, 6908.)

An indictment is defined by statute to be: "An accusation in writing, presented by a grand jury to a competent court, charging a person with a public offense." (Rev. Laws, 7022.)

The indictment should be found "when all the evidence, * * * taken together, is such as * * * would, if unexplained and uncontradicted, warrant a conviction by the trial jury." (Rev. Laws, 7026.)

"The grand jury must * * * inquire into the offenses cognizable by them." (Rev. Laws, 7015.)

"The grand jury must inquire into all public offenses committed, and triable within the jurisdiction of the court. * * *" (Rev. Laws, 7020.)

The foreman and members of the grand jury are required to take oath to "inquire into, and true presentment make of, all offenses against the State of Nevada committed and triable within this county, of which you shall have or can obtain legal evidence." (Rev. Laws, 7012, 7013.)

In *State* v. *Chamberlain*, 6 Nev. 257, it was held that an allegation of the county wherein a crime is committed is necessary, notwithstanding the statutory form of indictment makes no reference to the county.

The prosecuting witness, who swore to the complaints in the cases in which they were arrested under the warrants of the committing magistrate of Eureka County, states in his testimony before this court that he does not know that they were in Eureka County; and there is no evidence, contrary to the positive testimony of witnesses on their behalf, that they were not there. The attorney for the state declined to make any admission; but a failure to deny or offer any testimony against the evidence submitted by the petitioners, or to claim that the state could produce any contrary evidence upon a trial, is deemed equivalent to an admission. In the absence of any claim or showing that the petitioners have committed some act which is made criminal and punishable in Eureka County, and in view of the uncontradicted evidence submitted by the petitioners, the accused are entitled to liberty, under the constitutional right to the writ of *habeas corpus* for the protection of the citizen.

Respondent appears to be in the position of asking this court to ignore, or in effect to repeal, the plain provisions of the *habeas corpus* statute for hearing testimony and discharging accused persons, and of urging this court to remand the petitioners to custody for trial, when, under the undisputed evidence presented, it appears that they have not committed acts which amount to felony, or other crime for which they are sought to be held and tried. Under these circumstances, it would not be observing the constitutional guaranties to liberty and the right to the writ for the release of persons held in custody without legal cause, nor just to the accused, nor to Eureka County and the state, to proceed to fruitless trials, with the incumbent trouble and expense to petitioners and taxpayers.

It is a well-recognized rule that, where a person is charged with felony and is bound over by a committing

magistrate, he will be discharged if the testimony which is required to be taken down by the magistrate does not show, and there is no evidence to indicate, that he is guilty of any offense. (*Ex Parte Willoughby*, 14 Nev. 451.)

In view of the provisions of our statute providing for the taking of testimony and the discharge of accused persons not detained in custody by virtue of final judgment of a competent court of criminal jurisdiction, and the indictment and bench warrant issued under it being previous to trial and not under the final judgment of a court of competent jurisdiction, no good reason appears why the accused should not be discharged in such cases as readily as in others before judgment; for he is entitled to release and liberty when there is no probable cause for believing that he has committed some act which the law declares to be criminal, and he is held in a case not allowed by law. The state ought not to proceed against persons criminally, unless there is reasonable or probable cause for believing, or some evidence tending to show, that they have committed some act which the law makes an offense.

After all, should not the controlling question be whether there is any probable cause or evidence to indicate that the accused has committed any act within the jurisdiction of the court, which the law makes criminal, or is there anything for it to try, or any evidence available to the state which would indicate the commission of an offense or sustain a conviction? Under our statute, with its liberal provisions for taking testimony and for the examination of the merits of the case, we see no reason why we should not investigate it to the bottom and discharge any of the petitioners, if justice requires, or if it is clear that they have not committed any acts within the county or the jurisdiction of the court, which the law makes criminal. Except as to the method of arriving at the facts, when we consider the real facts relating to any acts done by the petitioners, which are claimed to be criminal, these cases are not materially different from others which have been determined by this court.

In the Rickey case it was charged in the indictment that Rickey, who was a director and the president of an incorporated bank, had received the deposit through the teller. Differently than in the present proceeding, the attorneys for the state in that case, desiring to have a construction by this court of the statute in *habeas corpus* proceedings, and without burdening the county and the accused with the expense of a trial, frankly admitted that Rickey had not received the deposit personally, and freely left the court to determine whether the fact that he was a director and president of the bank made him guilty of receiving a deposit, or of any offense for which he would be properly triable by reason of his being a director and president of the bank at the time that the deposit was received by the teller.

In the Davis case (33 Nev. 309), after conviction in the justice's court, and again on appeal, the findings of fact were voluntarily submitted for the consideration of this court in the *habeas corpus* proceeding and the petitioners discharged, because, under our construction of the law, the acts committed by the petitioners did not constitute an offense, notwithstanding the justice's court and the district court had so held. It was held that, where the evidence, without conflict, shows that the defendant is exempted from the penal provisions of the statute, the court is without power to render a judgment of conviction.

A voluntary submission of the facts takes the place of testimony; and, if the real facts on a *habeas corpus* proceeding may be submitted by consent or stipulation and considered, no good reason appears why testimony may not be taken to establish the facts under our statute providing that the judge shall hear the evidence, regardless of whether opposition may be made to the taking of evidence. There are decisions, not in conflict with these views, which are directly distinguishable, because the petitioners in those cases did not present uncontradicted evidence showing want of probable cause, and that no acts had been committed by the person indicted or

charged with crime which were made criminal by law, or were within the jurisdiction of the court. In the Spencer case, 34 Nev. 240, we heard testimony for and against the petitioner on the application for a writ of *habeas corpus* and discharged him, because the evidence indicated that he was not within the jurisdiction of the court in Illinois, notwithstanding the requisition of the governor. In Waterman's case, 29 Nev. 288, 11 L. R. A. (N. S.) 424, 13 Ann. Cas. 926, we discharged him from the requisition of the governor, because the indictment found in another state did not state facts constituting an offense.

Is there not as much reason to protect the citizens of this state from being taken to another district, hundreds of miles away, the courts of which are clearly without any jurisdiction, as to protect citizens of other states from being removed from this state for trial to another state which has no jurisdiction, because they were absent and did not participate in any crime there? The statute makes no distinction. It, as well as the constitution and statutes of the United States, requires that the "judicial proceedings of the court of any state * * * shall have such faith and credit given to them in any court within the United States as they have by law or usage in the courts of the state from which they are taken." (Rev. Laws, 159, 526; Const. U. S. art. 4, sec. 1; Rev. Stats. 905.) It is evident that the reasons are quite as strong for discharging the petitioners here as in the Rickey, Smith, Davis, Spencer, and other cases. In *Ex Parte Dela*, 25 Nev. 346, 83 Am. St. Rep. 603, the petitioner was released upon *habeas corpus* from the final judgment of the district court, because he had been convicted of rape, when the indictment charged him with the crime of murder and with the commission of acts constituting both the crime of murder and rape.

In the case of *People* v. *Wells*, 57 App. Div. 140, 68 N. Y. Supp. 59, upon the return of a writ of *habeas corpus*, the sheriff held the custody of the prisoner by virtue of the commitment of a justice of the peace, to which a traverse was interposed, alleging that there was not

sufficient evidence before the justice that the alleged crime had been committed, or sufficient cause to believe the prisoner guilty thereof, to which traverse the sheriff interposed a demurrer, on the grounds that it did not state facts sufficient to constitute a traverse. The Supreme Court of New York held that the demurrer was not well taken, and that, in the absence of any evidence that the crime had been committed, or that the prisoner was guilty thereof, the magistrate was without jurisdiction. The court said: "This case presents a question of right upon a writ of *habeas corpus,* which is well termed the greatest writ of the common law, because it assures and secures personal liberty by simple and direct process available to every citizen. Its place is above debate and dissension. Hume, who wrote hatred of Whiggism into history, wrote: 'This law seems necessary for the protection of liberty in a mixed monarchy. As it has not place in any form of government, this consideration alone may induce us to prefer our present constitution to all others.' Junius, the friend of Wilkes, wrote of it to Lord Mansfield as 'so fully considered as another Magna Charta of the Kingdom.' The Tory Dr. Johnson, who wrote against Junius, said: 'The duration of parliament, whether for seven years or for the life of the king, appears to me so immaterial that I would not give half a crown to turn the scale one way or the other. The *habeas corpus* is the single advantage which our government has over all other countries.' And, quoting him, the Whig Macaulay, who also accused Hume of being a partisan historian, said: 'It is, indeed, not wonderful that the great law should be prized by all Englishmen, for it is a law which, not by circumlocution, but by direct operation, adds to the security and happiness of every inhabitant of the realm.' And a later historian, Goldwin Smith, writes that, among the five checks reckoned against absolutism, the *habeas corpus* has a place with the control by parliament over legislation, its legislative authority, the liability of royal officers to suit and impeachment, and the trial by jury. (The United Kingdom, vol. 1, p.

296.)   The value of the writ of *habeas corpus*, says Kent (Lect. XXIV, 32), is that 'personal liberty is not left to rest for its security upon general and abstract declarations of right.' The courts are jealous to assert that this right cannot be emasculated or curtailed by legislation. They should be jealous to declare its inviolability from any attacks in their own fora that menace its sweep and its power.   There is a principle underlying this case beyond its instance that warrants a plain pronouncement of the law."

In *State* v. *Beaverstad*, 12 N. D. 527, 97 N. W. 548, it was held that jurisdictional matters only, and not irregularities and errors, can be reviewed on *habeas corpus*, and that where one is committed upon a criminal charge, without reasonable or probable cause, he may secure his release on *habeas corpus*, and that the court issuing the writ will look into the evidence far enough to see whether there is any tending to show that an offense was committed, and that there was cause to believe that the accused committed it.

In *Re Snell*, 31 Minn. 110, 16 N. W. 692, it was held that the evidence upon which the prisoner is bound over and committed by a justice of the peace may be examined by the court or officer before whom the prisoner is brought on *habeas corpus*, for the purpose of determining whether it fairly tends to show the commission of an offense, and whether it fairly tends to make out probable cause for charging the prisoner with its commission; but that the judgment of the committing magistrate should not be rejudged, upon inquiry into the weight of the evidence, further than necessary to determine these two propositions.

In *Re Brenner*, 3 Wyo. 412, 26 Pac. 993, it was held in a *habeas corpus* proceeding that where the evidence certified by a committing magistrate fails to show the venue the commitment is fatally defective, and that where the application is to the supreme court, and the expense of supplying such evidence would be burdensome to the parties, the prisoner may be discharged.

In *Re Snyder*, 17 Kan. 542, it was held that the court or judge issuing a writ of *habeas corpus*, on a petition complaining that the person in whose behalf the writ is applied for is restrained of his liberty without probable cause, may, although there is no defect in the charge or process, summon the prosecuting witnesses, investigate the criminal charge, and discharge, admit to bail, or recommit the prisoner, as may be just and legal.

In *Ex Parte Champion*, 52 Ala. 311, it was held that a prisoner under a commitment of a justice of the peace may apply to the probate judge for a writ of *habeas corpus*, and that it is the duty of the judge to hear and pass upon the evidence touching the prisoner's guilt, and to discharge him if it appears that no offense has been committed, or if there is not probable cause for charging the prisoner.

In *Ex Parte Mahone*, 30 Ala. 49, 68 Am. Dec. 111, it was held that the accused has the right to offer evidence on *habeas corpus* touching his guilt, and that *mandamus* lies to compel a judicial officer to hear evidence on *habeas corpus* touching the guilt of a person before him. The court said: "We think a prisoner who is in custody simply on a warrant of commitment, issued after preliminary examination, and before any indictment has been found, can, when brought on *habeas corpus* before a proper officer, claim, as a matter of right, that such officer shall hear and pass on all legal evidence which he offers touching the question of his guilt. If, on such examination, 'it appears that no offense has been committed, or that there is no probable cause for charging the defendant therewith,' the prisoner must be discharged. 'If it appear that an offense has been committed, and there is probable cause to believe the defendant is guilty thereof,' the defendant must be bailed or committed as the law directs. (Code, secs. 3405, 3406.) In determining, as stated above, that prisoners can claim, as a matter of right, to have their witnesses heard, we think we are giving effect to the provisions of the code."

In *People* v. *Moss*, 187 N. Y. 410, 80 N. E. 384, 11 L. R. A. (N. S.) 528, 10 Ann. Cas. 309, it was held that, upon a writ

of *habeas corpus* to review the legality of a petitioner's restraint on a warrant issued by a magistrate, the court will look back of the warrant and ascertain if the facts stated in the depositions of the prosecutor and his witnesses were sufficient to confer jurisdiction on the magistrate to issue the warrant.

In *State* v. *Huegin,* 110 Wis. 189, 85 N. W. 1047, 62 L. R. A. 700, a Wisconsin case, it was held that on *habeas corpus* proceedings the court has jurisdiction to examine into the sufficiency of the complaint of the committing magistrate to charge a criminal offense, and to the evidence as regards whether it will admit of a reasonable inference of the existence of the ultimate facts necessary to show that the offense was committed, and that there is probable cause for believing the accused to be guilty. It was further held that a *habeas corpus* suit reaches only jurisdictional errors, and that it does not reach beyond the commitment to the proceedings leading up thereto, where the person in custody is detained by virtue of the final judgment or order of a court having jurisdiction of the subject-matter, and the person in custody is being held on a commitment for trial, and that a preliminary examination is not an action, and that the determination thereof is not a final judgment. It was said that, where an examining magistrate acts upon evidence, and such evidence, looking at it from the most favorable standpoint, will not reasonably permit of the action of the magistrate, the error is jurisdictional and remediable by writ of *habeas corpus,* within the rule that such errors only can be reached by such writ.

In *People* v. *Sheriff,* 11 Civ. Proc. R. (N. Y. 172), it was held that, where a return is made to a writ of *habeas corpus* that the relator is held by virtue of a bench warrant, issued by a court of general jurisdiction upon an indictment found by a grand jury, the magistrate may go behind such return and inquire as to the validity of the process, although the number of matters subject to inquiry is limited for lack of evidence, though not from lack of power to make them.

In *Re Hardigan*, 57 Vt. 100, it was held that in a *habeas corpus* hearing the rights of relator were not dependent upon the officer's return, and that he may deny the return and allege other material facts.

In *Re Farrell*, 36 Mont. 259, 92 Pac. 786, the court said: "If it were a case of a defective information only, it might well be contended, as the attorney-general contends here, that the district court had judisdiction, and that this court should require the complainant to seek relief through the medium of his appeals. But if an information states facts which do not constitute any crime known to the law, or undertakes to state such an offense, but the facts stated do not constitute the offense, and no addition to them, however full and complete, can supply what is essential, then the court is without jurisdiction to put the complainant on trial. In such case the judgment cannot be corrected. It is simply void. Imprisonment under execution thereon is illegal, and the complainant is entitled to his release even though he might secure the same relief on appeal." (*State* v. *District Court*, 35 Mont. 321, 89 Pac. 63.)

In *Ex Parte Sternes*, 82 Cal. 246, 23 Pac. 38, the court said: "Petitioner thereupon offered to prove, and to introduce competent evidence for that purpose, that he was held by the magistrate and committed without probable cause, and claimed that upon making such proof he would be entitled to his discharge under subdivision 1487 of the penal code. To the introduction of this proof, the respondent objected, on the ground that this court was precluded from going behind the warrant of commitment and inquiring into the question of reasonable or probable cause by reason of the fact that an information had already been filed against the prisoner, claiming that the information took the place of an indictment by the grand jury, and had the same force and effect upon *habeas corpus*. Upon a brief consultation upon the bench, a majority of the justices then sitting were inclined to that view of the case, and, the warrant of commitment being regular upon its face, and issued by a court of

competent jurisdiction, it was ordered that the prisoner be remanded. Subsequently the petitioner moved the court to set aside the order so made and allow the parties to file briefs upon the question of the admissibility of the testimony so offered, and the court, having doubts about the correctness of its ruling, granted the motion. Subsequently the parties were heard in open court upon the subject, and the testimony, consisting of the depositions and transcript of the evidence taken by the committing magistrate, was offered and received, subject to the final conclusion of the court as to the admissibility thereof. Upon more mature deliberation, we have concluded that we have not only the right, but that it is our duty, to inquire into the question of reasonable or probable cause, notwithstanding the filing of the information, and that the evidence tending to show whether there was such reasonable or probable cause is admissible, and the same is admitted."

In *People* v. *Hyatt*, 172 N. Y. 176, 64 N. E. 825, 60 L. R. A. 775, 92 Am. St. Rep. 706, it was held in *habeas corpus* proceedings that a crime will not be presumed to have been committed on a day when the accused was in the state, for the purpose of upholding extradition proceedings against him as a fugitive from justice, if the indictment charges its commission on an earlier date, when no claim or suggestion is made of error in the charge. When that case reached the Supreme Court of the United States (188 U. S. 711, 23 Sup. Ct. 459, 46 L. Ed. 661), the court said: "The indictments in this case named certain dates as the times when the crimes were committed, and where in a proceeding like this there is no proof, or offer of proof, to show that the crimes were in truth committed on some other day than those named in the indictments, and that the dates therein named were erroneously stated, it is sufficient for the party charged to show that he was not in the state at the times named in the indictments; and when these facts are proved, so that there is no dispute in regard to them, and there is no claim of any error in the dates named in the

indictments, the facts so proved are sufficient to show that the person was not in the state when the crimes were, if ever, committed."

In *U. S.* v. *Greene* (D. C.), 100 Fed. 941, it was held that under the United States Revised Statutes, sec. 1014 (U. S. Comp. St. 1901, p. 716), which constitutes the only authority for arrest and removal to another district for trial of a person there charged with an offense against the United States, the proceedings before a commissioner for the commitment of a person so arrested is the same as that prescribed by the laws of the state for proceedings before a committing magistrate, the only issue before the commissioner being as to whether there is probable cause to believe the defendant guilty of the offense charged; and that the evidence admissible upon that issue is determined by the state practice; and that, as, under the laws of New York, the defendant is entitled to produce the testimony of witnesses, or any other competent evidence in his behalf, the exclusion of such evidence by a commissioner in that state is unwarranted. It was said further that, while an indictment is admissible in evidence in such a proceeding upon the question of probable cause, it is not conclusive, but is entitled to weight only as an affidavit tending to establish the facts and circumstances therein alleged.

In *Ex Parte Roquemore*, 60 Tex. Cr. R. 282, 131 S. W. 1101, 32 L. R. A. (N. S.) 1186, decided in November, 1910, the Texas Court of Criminal Appeals held that *habeas corpus* lies for the release of one in custody under conviction upon a complaint which charged no offense under the laws of the state, because no law existed making the acts committed by the accused an offense, although he did not pursue his remedy by appeal after trial and conviction. The court said: "We are met at the threshold of the case with the suggestion by our able assistant attorney-general that the writ of *habeas corpus* cannot apply in this character of proceeding; that it is sought merely as a method of appeal or *supersedeas*, and, under the authority of the cases of *Ex Parte Scwartz*, 2 Tex. App. 74, *Perry* v. *State*,

41 Tex. 488, *Ex Parte Dickerson,* 30 Tex. App. 448, 17 S. W. 1076, and the still later case of *Ex Parte Cox,* 53 Tex. Cr. R. 240, 109 S. W. 369, cannot be entertained; and that the judgments of inferior courts can only be attacked by writ of *habeas corpus* for such illegalities as render them void (*Ex Parte Gibson,* 31 Cal. 619, 91 Am. Dec. 546); and that the erroneous judgments of inferior courts having jurisdiction of the subject-matter and of the person cannot be successfully attacked upon *habeas corpus,* unless they are so far erroneous as to be absolutely void (9 Am. & Eng. Ency. Law, p. 222); and that it is only when the proceeding is void that the writ of *habeas corpus* may be resorted to. (*Ex Parte Slaren,* 3 Tex. App. 662, and *Ex Parte Boland,* 11 Tex. App. 166.) That these general rules obtain, there can be no sort of question; but, as we believe, they have no application to the case here.  *  *  * It is elementary, before a citizen can be punished as a criminal, that the offense must be clearly defined by statute and an appropriate penalty affixed thereto."

In *Tinsley* v. *Treat,* 205 U. S. 20, 27 Sup. Ct. 430, 51 L. Ed. 689, it was held that evidence tending to show that no offense triable in the federal district court, to which the accused is sought to be removed, has been committed by him in that district cannot be excluded in the removal proceedings, on the theory that a certified copy of the indictment and proof of the identity of the party accused furnishes conclusive evidence of probable cause. The court said: "It was held in *Beavers* v. *Henkel* (194 U. S. 73, 24 Sup. Ct. 605, 48 L. Ed. 882), *supra, Benson* v. *Henkel* (198 U. S. 1, 25 Sup. Ct. 569, 49 L. Ed. 919), *Hyde* v. *Shine* (199 U. S. 62, 25 Sup. Ct. 760, 50 L. Ed. 90), as well as *Greene* v. *Henkel* (183 U. S. 249, 22 Sup. Ct. 218, 46 L. Ed. 177), *supra,* that an indictment constituted *prima facie* evidence of probable cause, but not that it was conclusive."

In *Ex Parte Royall,* 117 U. S. 242, 6 Sup. Ct. 734, 29 L. Ed. 868, it was held that, where a person is in custody under process from the state court of original jurisdiction for an offense against the laws of such state, and it is

claimed that he is restrained of his liberty in violation of the federal constitution, the circuit court has a discretion whether it will discharge him upon *habeas corpus* in advance of the trial in the state court.

In *U. S.* v. *Fowkes,* 53 Fed. 13, 3 C. C. A. 394, the opinion affirms the decision of the United States District Court, and was sustained by the United States Supreme Court in 149 U. S. 789, 13 Sup. Ct. 1053, 37 L. Ed. 963. The person charged had been arrested in Pennsylvania for a violation of the interstate commerce act, and held for removal to Missouri to answer an indictment there found. Notwithstanding the indictment, he was released upon *habeas corpus* because he had not committed any offense in Missouri. The federal judicial districts of Pennsylvania and Missouri are as distinct as the different districts of a state. Referring to the district court, the circuit court of appeals said: "The court did not try the case, but the learned judge did require that he should be satisfied before you deprive the relator of his personal liberty and order his transfer to a distant state for trial; that there was evidence on which a jury might convict in that state."

The circuit court of appeals further said: "The court alleged to have such cognizance in this case is a district court of the United States in Missouri. If he had committed a crime against the United States, and, if the district court referred to did have cognizance of it, the prisoner was, of course, lawfully held; but if either of these facts did not exist, then his imprisonment, being without the sanction of the only law of the United States relied upon for its justification, was violative of that law. It follows from what has been said that it was the duty of the district court, making 'inquiry into the cause of restraint of liberty' (Rev. St. 752) in the case of the relator, who alleged that he was in custody in violation of law, to direct that inquiry to the matters we have alluded to as relevant to the issue joined upon that allegation. (*Horner* v. *U. S.,* 143 U. S. 207, 12 Sup. Ct. 407, 36 L. Ed. 126.) Of this there can be no

doubt; and, indeed, we do not understand that the learned district attorney has questioned the soundness of this general proposition, thus broadly stated, but that his contention relates only to the character of the inquiry which should be made and the extent to which it should be carried. The position taken on behalf of the United States is that the district court could not look beyond the indictment and the action of the commissioner by whom the relator had been committed; and this position was adhered to throughout the proceedings in that court, notwithstanding the fact that ample opportunity was afforded the appellant to produce evidence to refute that which was presented on behalf of the appellee. We, however, cannot sustain this view of the law. We do not doubt that a district court may, in its discretion, and in a proper case, order a warrant of removal upon the indictment alone; but it would be going much further, and much too far, as we think, to hold that in all cases, and especially in such a case as this record discloses, the judge is precluded from hearing any other evidence whatever, and must, upon mere inspection of the indictment, order the removal of the accused person to a considerable distance for trial, although evidence be offered which, if received, would conclusively establish that the court to which it is asked that he shall be remanded is without jurisdiction to try him. * * * The court, as already remarked, did not try the case, but the learned judge did require that he should be satisfied, before he would deprive the relator of his personal liberty and order his transfer to a distant state for trial, that there was evidence on which a jury might convict in that state. Yet no evidence whatever was offered on behalf of the government; and the only question which remains is as to whether the circumstances alleged and proved by the appellee justified the requirement that some evidence should be produced by the appellant. As was said by the learned judge, the circumstances were extraordinary. After a careful examination of the record, we adopt his statement of

them: 'The relator, having been arrested and bound over to court, charged with the commission of crime in the State of Missouri, sued out a writ of *habeas corpus,* and the district attorney at the same time applied for a warrant of removal. On return of the writ, an indictment, found in Missouri, charging him with violation of section 10 of the interstate commerce statute, was presented in justification of the arrest and detention. In answer his counsel represented that the indictment was found without previous hearing, and that no hearing (except in form) has yet been allowed him; that no evidence can be produced to support the charge; that he has never been within the State of Missouri; that he has no connection with any other railroad than that of the Philadelphia and Reading Railroad Company, and that his connection with it, when the indictment was found, and previously, conferred upon him no authority whatever over the freight rates or charges for transportation, and that he never assumed, or attempted to exercise such authority; that he was simply freight claim agent of the company; and that his duties as such consisted in passing upon claims, and certifying his conclusions, for compensation on account of erroneous exactions in excess of the established rates, and for loss of or damage to property received by the company for transportation. In view of these representations, the relator was permitted to introduce evidence in support of them. The testimony heard (the truth of which is not questioned, as I understand) fully supports the representations.' "

Some of the earlier cases hold that a person charged with crime under an unconstitutional statute could not be released upon *habeas corpus,* and would be remanded for trial; but since the Supreme Court of the United States decided otherwise the cases generally hold that a person arrested under an unconstitutional statute will be discharged upon *habeas corpus.* Several decisions of this court are in accord with the Supreme Court of the United States. (*Ex Parte Rosenblatt,* 19 Nev. 439, 3 Am. St. Rep.

901; *Ex Parte Kair*, 28 Nev. 127, 113 Am. St. Rep. 817, 6 Ann. Cas. 893.)

In Church on *Habeas Corpus*, at section 83, it is said: "At one time the courts did not favor the practice of looking into the constitutionality of a statute, in *habeas corpus* proceedings, to determine whether a party was rightfully imprisoned or lawfully convicted; but since the decision of the Supreme Court of the United States, in *Ex Parte Siebold*, 100 U. S. 371, 25 L. Ed. 717, the state courts are following the rule there laid down that the constitutionality of a law under which a person is imprisoned or convicted, is a proper matter for consideration on *habeas corpus*, because 'an unconstitutional law is void, and is as no law. An offense created by it is not a crime. A conviction under it is not merely erroneous, but is illegal and void, and cannot be a legal cause of imprisonment.' The same courts are following this rule for the sake of harmony; and the prevailing doctrine in state courts now is that the court will review, upon *habeas corpus*, the question of the constitutionality of an act or ordinance under which the petitioner has been convicted, or by virtue of which he is imprisoned; and, if such an act or ordinance is found to be unconstitutional, the prisoner will be discharged."

The rule being settled here that any person held in custody, because charged with an act forbidden by an unconstitutional statute, will be discharged upon *habeas corpus*, it naturally follows that a person charged with the commission of an act which is not made criminal by any statute is at least as innocent as a person who has committed some act forbidden by an unconstitutional statute.

Analogous to this now well-established rule that before or after conviction the court will discharge, on *habeas corpus*, a person who is held under an unconstitutional act of the legislature, reasons are quite as apparent for holding that an accused person will be discharged under a writ of *habeas corpus*, where he is held for some act which the law does not make criminal. Certainly a citi-

zen who has not infringed any statute is as much entitled to his liberty and to be free from prosecution as the person who has violated an unconstitutional act, and the court is as much without jurisdiction.

At section 236 of Church on *Habeas Corpus*, it is said: "When it appears on the return that the prisoner is detained by virtue of any process, civil or criminal, from any court of competent jurisdiction, or issued by any officer in the course of judicial proceedings before him, authorized by law, and the process is regular and valid upon its face, the presumption will be in favor of the legality of such imprisonment; and the burden of impeaching its legality will be thrown upon the prisoner. But this he may do in various ways. He may show that the jurisdiction of such court or officer has been exceeded; that there has been some act, omission, or event, which has taken place since the issuing of the process, which entitles him to be discharged therefrom; that the process is defective in some matter of substance required by law; that, though proper in form, it has been issued in a case not allowed by law; that the person having his custody is not the person allowed by law to detain him; that the process is not, in reality, authorized by any order, judgment, or decree of any court, or by any provision of law, or that he has been committed without reasonable or probable cause. Mere errors and irregularities of procedure, however, not affecting the question of jurisdiction, are never reviewable on *habeas corpus*, and, where the process is regular and valid upon its face, there is no doubt that a preponderance of authority supports the rule that inquiry, on *habeas corpus*, will go only to the question of jurisdiction, in the absence of a statute authorizing the court or judge to review the sufficiency of the evidence upon which such process may be founded. But jurisdiction is always an open question, and may be inquired into by any court or judge competent to issue the writ. Thus the prisoner may be discharged on *habeas corpus*, either before or after judgment, where the statute or ordinance under which the proceedings are inau-

gurated against him is unconstitutional, as this is a jurisdictional defect, or where the complaint or commitment does not charge any crime known to the law."

It is well settled that upon a motion to quash an indictment a court can go behind an indictment, regular upon its face, and determine if it is void for any latent defect. (*U. S.* v. *Farrington,* 5 Fed. 343; *Eubanks* v. *State,* 5 Okl. Cr. 325, 114 Pac. 748; *Commonwealth* v. *Green,* 126 Pa. 531, 17 Atl. 878, 12 Am. St. Rep. 894; *People* v. *Lauder,* 82 Mich. 109, 116, 46 N. W. 956; *State* v. *Symonds,* 36 Me. 128; *Sparrenberger* v. *State,* 53 Ala. 481, 25 Am. Rep. 643; *State* v. *Lanier,* 90 N. C. 714; 22 Cyc. 206; 20 Cyc. 1347; *State* v. *Logan,* 1 Nev. 509.)

In *Eubanks* v. *State, supra,* the court held: "It is as much the duty of the grand jury to protect the innocent as to accuse the guilty. It should shield the citizen alike from the false accusation of private malice and the passion of the public clamor. It should never be used for the gratification of personal ill-will or hatred, or to promote the secret plottings of power, party, or faction, to defame the name, or to disgrace those whom public or private enemies wished to destroy. For those and many other reasons, its proceedings should be had with that deliberation and dignity that the importance of its functions require. As was said by Mr. Justice Tarsney, in the case of *Royce* v. *Territory,* 5 Okl. 61, 47 Pac. 1083: 'As the grand jury is an informing and accusing body, which makes its investigation and holds its deliberations in secret, and irresponsible for its official action upon matters of fact, except before the tribunal of public opinion, it is very important that its powers, duties, and methods of procedure should be well understood and should be strictly confined within the conservative and salutary limits imposed by law, which experience has shown to be necessary to subserve the public good and to accomplish a just and impartial administration of the criminal law.' Mr. Rice, in his work on Criminal Evidence (vol. 3, p. 40), says: 'The jealousy with which the early law guarded the secrets

of the grand jury room has largely disappeared. The sacramental character of that august body is very imperfectly recognized at the present day. The theory that the proceedings before this body are beyond the scrutiny or condemnation of court or counsel is a foolish pretense that is very generally abandoned. Malice, corruption, and ignorance frequently combine to impress upon the proceedings of this body the tyrannical and oppressive functions of the Star Chamber and the Council of Ten. And to say, or even intimate, that, where corrupt practices exist, there is no method open for their proper disclosure is simply to insist that our criminal law is crippled with a hideous deformity.' The common-law rule of secrecy has no place under the provisions of our criminal procedure, which recognizes personal constitutional right as superior to every other consideration, and, whenever it becomes essential to the ends of justice to ascertain what has occurred before a grand jury, it may be shown by the testimony of the grand jurors, and particularly whether or not a vote or ballot was taken, showing the concurrence of the necessary number of grand jurors to find a true bill; the only limitation being that a grand juror will not be permitted to testify how any member of the jury voted, or the opinion expressed by any of them upon any question during their investigations."

In *U. S.* v. *Farrington, supra,* the court said: "It is the duty of the court, in the control of its proceedings, to see to it that no person shall be subjected to the expense, vexation, and contumely of a trial for a criminal offense, unless the charge has been investigated and a reasonable foundation shown for an indictment or information. It is due, also, to the government to require, before the trial of an accused person, a fair preliminary investigation of the charges against him. It is not the province of the court to sit in review of the investigations of a grand jury as upon the review of a trial when error is alleged; but in extreme cases, when the court can see that the finding of a grand jury is based upon such utterly insuf-

ficient evidence, or such palpably incompetent evidence, as to indicate that the indictment resulted from prejudice, or was found in wilful disregard of the rights of the accused, the court should interfere and quash the indictment."

Our attention has been called to some late decisions. In the cases of La Due, 120 Pac. 13, and Maginnis, 121 Pac. 723, there was substantial conflict in the evidence, jurisdiction in the court, and probable cause, or other reasons for remanding the persons in custody, different from the cases now before this court, or cases in which the acts, for the commission of which accused is held, constitute no crime.   In *Ex Parte Milsap*, 29 Okl. 472, 118 Pac. 135, the court cites *In re Newton*, 16 Com. B. 97, and *Ex Parte Edgington*, 10 Nev. 215.   Differently than here, in those cases the accused persons were held under final judgment and process; and, as indicated by the statement of facts in the Edgington case, the trial court had jurisdiction under the act of the legislature, and correctly so held, and the prisoner was properly remanded by this court.   If the trial court had been without jurisdiction, the last sentence of the opinion would be modified by our decision in the Davis and other cases, in which the petitioners, after final judgment, were discharged on *habeas corpus*.   The same modification is true regarding *Ex Parte Winston*, 9 Nev. 71, which is also distinguishable from the present cases, because the petitioner was held after trial and judgment.   Following the review of that case, it is said in the note at 87 Am. St. Rep. 177:  "The Supreme Court of California has, on at least two occasions, inquired, in *habeas corpus* proceedings, as to whether the statute or ordinance under which the petitioner stood convicted had been repealed.   See *Ex Parte White*, 67 Cal. 102, 7 Pac. 186; *Ex Parte Armstrong*, 96 Cal. 655, 24 Pac. 598.   If courts, on *habeas corpus* proceedings, may inquire into the constitutionality of the statute under which the petitioner has been convicted and sentenced—and by the weight of authority they can— then we fail to see any good reason why they may not

with equal propriety inquire into the question of the repeal of the statute. In either case, if the determination is favorable to the petitioner, there is, in fact, no statute no offense, and no judgment."

In the opinion in *Re Patzwald*, 5 Okl. 789, 50 Pac. 139, 87 Am. St. Rep. 170, it is said:

"There is no question but that at the common law, and in the absence of a statute, illegality which makes void a judgment in a criminal action, no matter by what court such judgment may have been rendered, may be inquired into on *habeas corpus;* and, if the judgment is found to be void, the prisoner may be discharged. Does our statute change this rule of the common law, and take away this right of inquiry? If such were the intended effect of the statute, our answer would be: The power is not in the legislature to take away this right. * * * That provision of the constitution (art. 1, sec. 10) is a guaranty that the right of *habeas corpus* should remain as it existed at the common law, and should not be curtailed by legislative enactment, or by subtle and metaphysical interpretation; and legislatures can no more prevent its application to cases where it would have been applicable at common law than they can abrogate the right of trial by jury. Nor do we think that it was intended by our legislature to curtail the privileges of this writ."

Opinions stating in effect that the decisions of courts holding that they have jurisdiction will not be disturbed do not apply or stand as correct in all cases, when closely analyzed. To hold otherwise would be to say that the court has jurisdiction to determine whether it has jurisdiction, and that its determination that it has jurisdiction is conclusive. This would allow any court to fix its own jurisdiction, instead of limiting it to the jurisdiction which can be fixed only by the constitution and the legislature. More correctly speaking, it is the duty of the court to determine whether it has jurisdiction of any case presented, and it has power to determine that it has jurisdiction, when conferred by the constitution and the statutes; but if the court erroneously holds that it has jurisdiction,

when not conferred by the constitution and the laws, it cannot thereby give itself jurisdiction. The same reasoning applies to the power of the court to act in a case if the statute giving it jurisdiction has been repealed. If it determines that the statute giving it jurisdiction has not been repealed, and in fact it has not been repealed, the court properly retains jurisdiction; but if the court determines that the statute giving it jurisdiction has not been repealed, when in fact it has been repealed, the court has no jurisdiction, and would be properly restrained from attempting to exercise any, or to hold the accused in a case not provided by law.

These conclusions are illustrated by occurrences. In early times a justice of the peace tried and executed a man for murder. His determination or assumption that he had jurisdiction did not give him any; for the constitution is conclusive that no court has jurisdiction to try a man for murder, excepting the district court, upon indictment of a grand jury. Many years ago the legislature made the selling of whisky to Indians a felony. The statute was changed to make it a misdemeanor. Later the statute was again changed to make this offense a felony. The justice's court could not give itself jurisdiction to try an offender by determining that it had jurisdiction when the law made the offense a felony; and the district court could not give itself jurisdiction to try an offender when the law made the offense a misdemeanor. Hence it is proper for this court to determine whether the court or magistrate seeking to hold the petitioners in custody are clothed with jurisdiction by reason of the commission of any acts which the law, as now in force and unrepealed, makes criminal, which it is claimed on behalf of the state to have been committed by the petitioners. Any other rule of construction might deny to the law-abiding citizen the just protection and release from custody under a writ of *habeas corpus*, guaranteed to him by the constitution, and which courts and judges having power to issue the writ are under statutory penalty to issue, when proper application is made.

A court cannot confer jurisdiction upon itself through an indictment or other criminal complaint, when the acts committed do not constitute an offense. This jurisdiction is fixed by the constitution, which gives the district court jurisdiction in felony cases and the justice's court in misdemeanors, and by the legislature, which designates the acts which constitute felonies and misdemeanors. The court or a grand jury, by a statement in an indictment that they accuse a person of felony, cannot make him guilty of or properly triable for felony, if the act he has committed is not made felonious by law. If an indictment should charge a person with felony for smoking cigars or drinking alcohol, or cooking on Sunday, which was an offense in early colonial times, such an indictment would not give a district court in this state any jurisdiction to try the accused, and if held in custody for trial he would be properly released on *habeas corpus;* the purpose of the writ being to release the citizen whenever he is unjustly or illegally restrained. It is evident that any person ought to be discharged from arrest when it is clear and undisputed that he is held by reason of the commission of some act which the law does not prohibit, or has not penalized.

Notwithstanding it must be clear that an act is prohibited and penalized before any person is punishable or properly triable for its commission, it is evident that it is sought to punish or to remove for trial petitioners under a part of the indictments, because they were directors and officers of a bank which went into the hands of a receiver, although they were not in the bank, and did not personally receive deposits, at the time the bank is claimed to have become insolvent. Apparently it is sought to have a part of the petitioners tried and punished because they were directors of the bank, when not present or residing in the county where the bank was situated, on the assumption that, because they were such directors and officers, the inference would follow that they were receiving the deposits, assenting to and conniving at the reception of deposits which were being

received by the bank through its cashiers. But the statute which controls nowhere by its terms provides any penalty against petitioners or persons for merely acting as directors or officers of a bank, whether solvent or insolvent, or when receiving deposits and insolvent, except against officers or persons actually receiving deposits for the bank, knowing that it is insolvent.

Bringing new indictments after the petitioners have been discharged upon *habeas corpus,* and adding or omitting words in the charging part which cannot be supported by any evidence, does not bring the accused within the jurisdiction of the court, if we follow the mandate of the statute by hearing evidence and considering undisputed facts, and they show that the accused were not within the jurisdiction of the court, or did no act which the legislature has made punishable. Merely alleging that they received the deposits, when the evidence is clear that they were not in the county and not present, does not give the court jurisdiction to try them, when the statute provides no penalty for their acting as directors and officers of the bank, even if it was insolvent, and when the *habeas corpus* act directs that we hear the testimony and discharge the petitioners, if it is sought to hold them in a case not provided by law.

Although an indictment is the highest species of criminal complaint, no good reason appears why it should be more invulnerable than the judgment of a court, nor why it may not be attacked as readily as a judgment, when it is found in a tribunal which is without jurisdiction, and some discretion exercised in regard to setting it aside in proper cases. These will rarely occur. But whenever it is clearly shown that the court is without jurisdiction, because the acts for which it is sought to punish the accused are not criminal, or, if penalized, that the jurisdiction over them is exclusively in some other court, any judgment or indictment in any court so without jurisdiction is void, and does not authorize the detention of any person accused. In every such case he should be discharged as readily as if held under an indictment or

judgment for murder before a justice of the peace, or an indictment or judgment for walking on the street after dark before any court.

As the indictment is not conclusive against the objection that the court is without jurisdiction, but is presumptive evidence of the truth of its allegations, and the court can consider the evidence and the real facts, the burden of showing which clearly, in order to overcome the indictment, is upon the petitioners, the questions presented here, relating to whether the petitioners, who were not in Eureka, or at the bank, can be properly held under the indictment charging the receipt of deposits, are controlled or concluded by the cases of *Ex Parte Smith* and *Ex Parte Griffin*, two of the petitioners here, who were discharged under former indictments found in Eureka County and growing out of the closing of the same bank. Regarding those cases, we said in the opinion (33 Nev. 470): "Under the allegations of the indictment, which appears to have been carefully drawn, and which allegations, we understand from the admissions by the prosecution, state the correct facts, it does not appear that they constitute any offense known to the law. However, if the state or the grand jury has any evidence which would bring the case under the terms of the statute, or show that the defendant had authority to close the bank or prevent the reception of deposits therein when he knew the bank was insolvent and in failing circumstances, or if they have any evidence that he actually or personally received any deposit for the bank when he knew it was insolvent and in failing circumstances, or that he was an accessory to such reception under section 10 of the act covering crimes and punishments and the decisions of this court concerning the same, a new indictment alleging the necessary facts may be found, and, if so found, it will not be prejudiced or affected by the order in this proceeding."

Under these later indictments, pertaining to the offenses last mentioned, allegations, without evidence to support

them, have been inserted apparently for the purpose of holding the petitioners for trial, regardless of the decision of this court discharging the ones who applied in the former proceeding, and when the prosecution does not have, or claim to have, or offer, evidence of the commission of acts by the petitioners, which would sustain the allegations of the indictment, or make the petitioners guilty of any act amounting to the commission of a crime by receiving deposits, or conniving at or assenting to the reception of deposits in that county or elsewhere, while knowing the bank was insolvent. In holding in the former case (33 Nev. 466) that a person is not guilty, under the statute, of the offense of assenting to the receipt of a deposit, unless he has some inherent power to withhold assent, we said: "As these officers, when they have this authority, are made guilty when they fail to prevent the reception of deposits, knowing the bank is insolvent or in failing circumstances, evidently the legislature did not intend to make them guilty of the reception of deposits when they did not have this authority, unless they actually received the deposit. * * * If the specific provision in section 2, that officers having power to close the bank or prevent the reception of deposits shall be deemed guilty of assenting to the reception of deposits if they fail to exercise this authority, has been omitted from the statute, or could be ignored, still there is nothing in the language of section 1, nor in the law which makes an officer of an incorporated bank criminally liable, simply because he is such officer and knows that the bank is insolvent, and, without anything being done on his part, deposits are being received by some other officer or person for the bank."

We held that every person who might know that the bank was receiving deposits, such as a janitor, messenger, or telegraph operator, would not be guilty of assenting to the reception of deposits, even if present and knowing that such deposits were being made, and he was not authorized to prevent such reception or to close the bank.

If the state has no evidence which would make the petitioners guilty under this construction and these requirements, and none is offered or suggested to overcome the evidence introduced by the petitioners, it would seem that an effort is being made to hold the petitioners for trial in the cases last mentioned, contrary to the statute and the decision of this court discharging Smith and Griffin from custody under the former indictment, which decision suggested that new indictments could be found if there was evidence indicating guilt, but did not contemplate the finding of further indictments there, unless there was evidence showing that the accused had committed acts which constituted crime within the jurisdiction of the court.

The evidence here indicates that the petitioners, other than the cashiers who actually received deposits in the bank for the bank, were absent from the bank; and it is not shown that there is any evidence to indicate that they were authorized to close the bank or prevent the reception of a deposit or assent to its reception, excepting that they were individual and absent officers of the bank when it was doing business and receiving deposits through its cashier.

In a noted case, *Ex Parte Jenkins*, 2 Wall. Jr. 521, Fed. Cas. No. 7,259, the petitioners were three times arrested and three times discharged by writs of *habeas corpus*, the last arrest being under an indictment charging an assault with intent to kill. As here, for the purpose of holding and trying the accused, new indictments had been drawn, with allegations indicating the commission of an offense, when, under the real facts, none had been committed. On the hearing in the *habeas corpus* proceedings evidence was admitted to show that the petitioners were acting as deputy marshals of the United States in attempting to execute a warrant at the time of the assault, and consequently were justified and not guilty, and entitled to be discharged. "In all the cases it was held that the returns to the writs of *habeas corpus* were not conclusive, and that evidence would be received

of the actual state of the facts complained of in the prosecutions in the criminal cases and relied on in the civil action." (Hurd on *Habeas Corpus*, p. 149.)

In regard to the repeated charges against the petitioners, the evidence being uncontradicted that they were not in that county, or did not commit any act which the law makes criminal or over which the court has jurisdiction, the finding of an indictment with additional allegations supplied for the purpose of alleging an offense when the state does not have evidence to support the additional allegations of new indictments, or tending to show that an offense was committed, does not warrant the holding of a citizen in custody for trial. Where there is no probable cause, and no claim on the part of the state that he has committed any act which is an infraction of the law, when properly construed, he is entitled to his discharge.

Considering that section 1 of the statute makes it an offense for assenting to or conniving at the receipt of deposits, and section 2 goes further and provides that while officers shall be deemed to assent to the reception of deposits when they are authorized to close the bank or prevent the reception of deposits and fail to exercise such authority, and this court having held that persons merely acting as officers are not guilty of assenting to the reception of deposits when they are not specially authorized to close the bank or prevent the reception of deposits, it is apparent that they are not guilty of conniving at the reception of deposits when they do nothing to induce the making or reception of a deposit, except to serve as officers of a bank which is doing business. To be guilty of conniving requires some affirmative action, at least as much, if not more, than assenting.

We can imagine that in many ways officers of an incorporated bank might connive at the reception of deposits by advising or inducing the making or reception of deposits in the bank. It is not claimed that the petitioners did anything by way of conniving at the making or reception of deposits, except to act as officers of the bank. Therefore the circumstances fail to contain the

necessary elements to constitute the crime of conniving at the reception of deposits, as well as to constitue the crime of assenting to the reception of deposits. Omitting the indictments against the cashiers who actually received the deposits, indictments are found against other petitioners for assenting to the reception of deposits, conniving at the reception of deposits, and for actually receiving deposits, when they were not in the county or at the bank. It seems that it is sought by the district attorney, and counsel especially employed to assist him, to sustain all these charges under some sort of inference that, because a person is a director or officer of a bank, he is guilty of receiving, assenting to, and conniving at, the reception of a deposit received by the bank through the cashier or some other officer, who actually receives a deposit over the counter of the bank. If this theory were sustainable, the directors of the bank would become guilty of three offenses for each deposit so received while they knew that the bank was insolvent, merely by the inferences sought to be enforced that the directors are guilty of receiving the deposit, of assenting to and conniving at the reception of the deposit, when they may be away from the bank or out of the county, or out of the state, and do nothing in relation to the deposit.

Under the well-established rules of law, no person is to be three times, nor once, punished by inference; and the legislature has not said that it constitutes felony, or any offense, for a person to act as a director and officer of an insolvent bank which is doing business and receiving deposits, excepting that such director or officer has authority to close the bank or prevent the reception of deposits and fails to exercise such authority, in which case he is made guilty of assenting to the reception of deposits. Following the rule in regard to corporations in other cases, that the director or officer has no power to close the bank or prevent the reception of deposits, unless specially authorized—and it is not claimed here that any of the petitioners were specially authorized to close the bank or prevent the reception of deposits—under these

circumstances, did the petitioners, other than the ones who actually received the deposits, receive the deposits in law, or assent to or connive at the reception of deposits? The receipt by the cashier or teller of an individual banker would be the receipt by the banker in his absence, and the same would be true in regard to a partnership. It might be said that any one of the partners in a banking business would have the right to control and manage the business, the same as any partner in any other business; and that the partner who did not prevent the reception of a deposit, when he knew it was being received by the cashier or teller, would be assenting to the reception of a deposit. But in the case of a banking corporation the receipt by the cashier or teller is the receipt by the corporation, and not for the cashier or teller or for an officer of the bank; and a director or officer of an incorporated bank is not empowered to close the bank or prevent the reception of deposits, merely because he is such director or officer.

In the Rickey case we held that a deposit made in an incorporated bank was, in law, a receipt by the bank, and not a receipt by a director or officer of the bank who did not personally receive the money. We said: "The doctrine seems to be settled, without any conflict whatever, that in the case of an incorporated bank the receipt, in law, is by the corporation itself; that under facts as stated in the indictment in this case both the defendant and receiving teller were agents of the same principal, to wit, the corporation; and that, as between themselves, no relationship of principal and agent was involved. The assertion made by counsel for the state in their brief that 'the receipt of a deposit by an employee of an insolvent bank is the act of the president, or other officer having authority over the employee,' is not only not supported by any authority cited by them, but is opposed by the whole current of authority, both of text-writers and decisions of courts." (31 Nev. 104; 135 Am. St. Rep. 651.)

If the petitioners here had been private bankers, it might be claimed that the receipt of a deposit through

the cashier or teller at the bank in Eureka was a receipt by the petitioners, although they were absent from the county, because, in law, the receipt would be for their personal benefit. The provisions of the statute penalizing the receipt of a deposit cannot be construed to apply to the directors or officers of an incorporated bank merely because they are such directors or officers, when they have taken no action whatever in regard to the reception of deposits, and are absent from the county or the bank, although they are aware that the bank is, and for many years has been, doing business. Nor, under the language of the statute, does the mere fact that a person is an officer or director of a bank make him guilty of assenting to or conniving at the reception of a deposit.

The statute does not say that any person who is a director or officer of a bank shall be guilty of felony, merely because he is such officer and knows the bank is receiving deposits through some other officer when it is insolvent. That is all it appears the petitioners here did, excepting the ones who actually received the deposits; and nothing appears to combat the showing that they were not aware that the bank was insolvent before it closed. Under the rule stated, they are liable only for acts which are clearly made criminal; and it is not provided by the statute that they shall be liable for felony, merely because they were directors of the bank, absent at the time the deposits were received, even if they had known that the bank was insolvent.

There is testimony that petitioner Gorman, who had recently assumed the position of cashier of the bank, was not aware of the value of its securities. It does not appear that he and Golding, who preceded him as cashier, knew that the bank was insolvent, if it was insolvent, at the time it closed, or before the securities were shrunken by the panic or taken over for forced sale by the receiver. The receipt of deposits by them, if they did not know that the bank was insolvent, or if it did not become insolvent until later, did not constitute an offense.

On petitioners' behalf it is urged that the stockholders only would have power to close the bank, but regarding this we need not determine in this proceeding; for if it be conceded that the general management of the bank is vested in the board of directors, as it is ordinarily with all corporations; there is no pretense here that the board of directors were in session at any time when the bank is claimed to have been insolvent, or that any of the petitioners were ever authorized by the stockholders or the board of directors to close the bank or prevent the reception of deposits. Clearly no director or officer of the bank could have the power to close the bank or prevent the reception of deposits when unauthorized by either the board of directors or the stockholders; and there is no pretense here that any attempt was ever made by either the board of directors or the stockholders to confer authority upon any of the petitioners to close the bank or prevent the reception of deposits.

We can imagine a case in which the directors could be in session, and it might be contended that one director, having the casting vote when there was a tie, would have the authority to close the bank by voting for a resolution for the purpose.

Not only does the statute provide no punishment for being a director of a bank that fails, but it provides no punishment against the directors or officers of a failing bank for omission to call a directors' meeting to determine whether the bank shall be closed, or whether authority shall be delegated to some one to close it. Until a director or officer is given authority to close the bank and prevent the reception of deposits, he has no authority inherently or by law, and consequently, under the circumstances shown, is not guilty, unless he received the deposit personally. There is no pretense here that the petitioners, who are shown to have been absent from the county and the bank, or the cashiers at the counter, had been given any authority by either the board of directors or the stockholders to close the bank, or to prevent the reception of deposits by the bank.

As to whether, if a meeting of the board had been called for the purpose of determining whether the bank should be closed, a part or all of the petitioners would have appeared and voted to close the bank, we need not speculate. Under the conditions—a bank open, doing business, and receiving deposits for many years—the mere facts that the directors or officers of the bank are such officers or directors, that deposits are received by the cashier when he does not know that the bank is insolvent, and that the bank closes, or is closed by the bank examiner, whether solvent or insolvent, does not constitute any offense under the statute.

Under ordinary circumstances, and in cases where no proof was submitted by the petitioners, indictments such as these would be sufficient for holding persons accused; but it would seem that under our statute, and under the decisions of courts in other jurisdictions which have statutes providing for the taking of testimony in *habeas corpus* proceedings, the indictments are *prima facie* evidence that the accused are properly charged and ought to be held for trial, unless the accused show clearly that there is no evidence which justified the finding of the indictment or warranting the holding of the accused for trial. If there is any evidence indicating that the accused committed the crime with which he is charged, or evidence of such a character that a trial jury could consider it, act upon it, and find a verdict upon it which would be sustained by any substantial evidence, the accused ought to be remanded for trial, and not discharged on *habeas corpus* proceedings, no matter how much evidence the accused may have to show innocence; for as soon as a substantial conflict is raised in the material testimony relating to guilt there is something to try, something for a trial jury to act upon, and something for which the accused ought to be remanded for trial. But when, as in these cases, the petitioners introduce testimony indicating that they committed no acts which constitute an offense triable by or within the

jurisdiction of the district court of Eureka County, and the state offers no testimony or claim to contradict this, justice and the plain language of our *habeas corpus* act demand their discharge. Under this construction, the allegations in the indictments are presumed to be correct, in the absence of any testimony on the part of the accused; but this presumption of the correctness of the indictments may be overthrown by clear proof on the part of the accused, uncontradicted by the state, indicating that there is not evidence to sustain the material allegations of the indictments. But, if the state had any substantial evidence to sustain the material allegations of the indictments, the indictments would be conclusive to the extent of requiring the remanding to custody of the accused for trial.

The state does not offer or indicate that it has any evidence to contradict the testimony on the part of petitioners, or to show that the ones who were absent from the county committed any criminal acts there, or that petitioners knew the bank was insolvent at the time of the commission of any of the acts with which they were charged, or that the assets of the bank, before they were taken over for forced sale by the receiver, or until shrunken by the panic or forced sale of the receiver, were not ample to meet its obligations. Without evidence showing that the accused were aware that the bank was insolvent at the time of the commission of the acts with which they are charged, they were not punishable for any offense; and the state could not sustain a conviction. If the state is without evidence in this regard, or without other evidence to bring the cases within the jurisdiction of the court and sustain a conviction, it is far better for all concerned that the accused be discharged now. In the small town and county of Eureka, with only a few hundred qualified jurors, and with a few hundred depositors in the closed bank, the difficulty of securing a jury and the heavy expense incidental to the different trials of these petitioners under the various charges might

well-nigh bankrupt the county. And although no expense, however great, ought to prevent the trial of persons properly charged, against whom there is evidence to sustain a conviction, if there is no evidence to sustain a conviction for any offense within the jurisdiction of the court, the reasons are equally strong and apparent for discharging the petitioners now and saving the trouble and the great expense necessary for such trials, and of avoiding injustice to the accused by requiring them to defend through trials, when it is apparent now that they have not committed acts which the law makes criminal, or for which judgments of conviction against them could be sustained. If it clearly appears that the acts, for the commission of which it is sought to punish the accused, do not constitute an offense, the court is as much without jurisdiction before as after the trial; and it is better that they be discharged before instead of after trial.

A general act regulating banking was passed and approved March 24, 1909. This was superseded by a general act to regulate banking, passed at the next session of the legislature and approved March 22, 1911. Section 22 of the earlier act is as follows: "Any person who shall wilfully and knowingly subscribe to, or make, or cause to be made, any false statement or false entry in the books of any corporation transacting a banking business under this act, or who shall knowingly subscribe to or exhibit false papers, with the intent to deceive any person or persons authorized to examine into the affairs of any such corporation, or shall make, state or publish any false statement of the amount of the assets or liabilities of any such corporation, shall be deemed guilty of a felony and upon conviction thereof shall be imprisoned in the state penitentiary not less than one year nor more than five years." (Stats. 1909, p. 257.)

Section 16 of the later act is as follows: "Every officer, director, proprietor, partner, agent or clerk of any bank doing business under the laws of the State of Nevada, who knowingly or willingly subscribes to, or makes any false report or makes any false statement or entries in

books of such bank, or knowingly subscribes to or exhibits any false writings on paper with the intent to deceive any person or persons as to the condition of such bank, shall be deemed guilty of a felony, and shall be punished by a fine not to exceed one thousand dollars or by imprisonment in the state prison not to exceed five years, or by both such fine and imprisonment." (Stats. 1911, p. 297; Rev. Laws, 631.)

As part of the sections refer to similar matters and part of the language in both is the same, it is apparent that section 16 of the later act refers to and has worked over the subject-matter of section 22 of the earlier act. It will also be observed that the drastic provision in section 22 of the earlier act, making it a felony for any person to publish any false statement of the amount of the assets or liabilities of any bank, with a penalty of imprisonment from one to five years in the state penitentiary, has been omitted from the later act. The language of the earlier act was broad enough to make any person, including a newspaper proprietor, who might publish such a false statement without even knowing it to be false, liable to this penalty. Good reason may have appeared to the legislature for omitting from the later act a provision so dangerous. A general and comprehensive law, working over a former act and covering the subject-matter, supersedes and repeals the former act by implication, except as otherwise indicated.

In *State* v. *Lee*, 28 Nev. 389, we said: "A careful comparison of the two acts, however, leads to the conclusion that, under a well-settled rule of statutory construction, the entire act of 1899 is repealed by the act of 1905. The act of 1905 is a comprehensive measure, complete in itself, revising the whole subject-matter of the act of 1899, and evidently intended as a substitute for it, although it contains no express words to that effect. In the case of *Bartlet et al.* v. *King, Executor*, 12 Mass. 537, 7 Am. Dec. 99, the rule applicable to this case was stated as follows: 'A subsequent statute, revising the whole subject-matter of a former one, and evidently intended as a substitute

for it, although it contains no express words to that effect, must, on the principles of law, as well as in reason and common sense, operate to repeal the former.' This court has heretofore twice quoted with approval the rule as above declared in the Bartlet case, and it is supported by abundant authority from other courts. (*Thorpe* v. *Schooling*, 7 Nev. 15; *State* v. *Rogers*, 10 Nev. 319; *Mack* v. *Jastro*, 126 Cal. 132, 58 Pac. 372; *State Board of Health* v. *Ross*, 191 Ill. 87, 60 N. E. 811.) See, also, 26 Am. & Eng. Ency. Law, 2d ed. 731, and authorities cited in note 4." (*Union Trust Co.* v. *Trumbull*, 137 Ill. 146, 27 N. E. 24.)

Section 77, in the body of the later act relating to banking, provides: "All acts and parts of acts in conflict with the provisions of this act are hereby repealed, but such repeal shall not affect any civil actions or rights of action nor the prosecution of any person or persons for any offenses which may now exist or which have been heretofore committed under existing laws."

It will be noticed that the language of this section continues the right of action and prosecution under, and refers only to, acts and parts of acts in conflict with the later act. Acts and parts of acts not in conflict are not covered by the language of, or affected by, this provision, and are not continued in force by it, if they would have been repealed by implication or otherwise without it. The provision in the earlier act, making it a penalty to publish a false statement, is not in conflict with the provisions of the later act, which make no reference to the publication of a false statement, and therefore is not continued in force by the language of section 77. Both acts penalize the making of any false statement or false entry in the books of the bank, and certain other acts for which a conflicting or different penalty is specified in the two acts; the earlier one providing imprisonment for not less than one nor more than five years, and the later act a punishment by fine not exceeding $1,000 or by imprisonment not exceeding five years, or by both such fine and imprisonment.

By the express provision of the later act, the penalty of the earlier act is continued as a punishment for the commission of any act made criminal by both acts; but an act made criminal by the earlier act and not made criminal by the later act, not being in conflict with the later act, is not continued in force by the language of the later act, and is superseded and no longer in force or punishable, under the ordinary rule relating to repeals. Knowingly subscribing to a false report, and other acts, by an officer, director, proprietor, agent, or clerk of a bank are still punishable in the county where the report is subscribed or act committed; but there is no statute now in force penalizing the mere publication of a false report. If the reports sworn to in other counties were false, the liability for prosecution for perjury is in the county where the oath was taken.

In the brief we have been referred to a number of cases where indictments were held void or have been set aside. In these cases there was no valid grand jury, and the objections were generally made upon the ground that the indictment was found by a grand jury consisting of more or less than the number required by statute, or that the grand jury had not been impaneled by the officers authorized by law, or the questions arose upon appeal or in proceedings other than an application for a writ of *habeas corpus*.

It is contended that the indictments are void, because the district judge selected one of the county commissioners who was blind to act with him in drawing the grand jury. It was shown that this county commissioner had been in office for sixteen years, and had often assisted in the drawing of grand juries. In view of the presumption that officers do their duty, in the absence of any showing to the contrary, it is assumed that this county commissioner did his, and that the clerk and judge in drawing and certifying for the grand jury did theirs, and notwithstanding that he could not see that the men he selected for the grand jury were properly selected and

certified. The evidence that he was a capable county commissioner, of long experience, and that the names he selected for grand jurors were taken down. We do not think the fact that he had the misfortune to be blind would render the indictments void, or justify the release of petitioners from custody under the bench warrants. Milton and an eminent United States senator, who is rendering valuable service to the nation, are but illustrations of men without eyesight who have great minds and are more capable than ordinary mortals.

It is urged that the indictments ought to be set aside or held void by reason of certain conduct and prejudice of the district judge. There is testimony that he was bitter in denunciation of the officers of the bank; that he published a statement in the newspaper, and also denounced them at a citizens' meeting in the opera house called by him by printed notices; and that he said at the public meeting he would rather take any train robber, than Gorman or Oscar J. Smith, as receiver. Referring to the bank management, the district judge stated in his court that they had three qualifications for successful road agents to one for successful banking. He states that these remarks were not directed to the petitioners in particular, but more generally to bank wreckers, and that the meeting in the opera house was called by him for the purpose of answering statements which had been made by a candidate for governor. He announced his disqualification to preside at the trials of any indictments that might be found against the officers of the bank. Inference could have been drawn from the fact that this bank was the only one which had failed or had been doing business for many years in Eureka County. He states that a coterie in Eureka were backbiting him and had insulted his receiver, and were hampering him in the liquidation of the bank's affairs, and that in reference to them he said he "would bring the scoundrels before the next grand jury."

It is claimed that the conduct of the district judge shows such extreme prejudice on his part that the

petitioners ought to be discharged, because he ordered and participated in drawing the grand jury. It is generally held that the prejudice of the judge or the bias or disqualification of a grand juror is not ground for setting aside indictments by writs of *habeas corpus*. Section 7090 of the Revised Laws provides that an indictment must be set aside by the court in which the defendant is arraigned, upon motion, when the defendant has not been held to answer before the finding of the indictment, on any ground which would have been good ground for challenge, either to the panel or to an individual grand juror. Section 7004 provides the grounds for challenge to the panel; and section 7005 provides that a challenge to an individual grand juror may be interposed upon the ground that "a state of mind exists on his part in reference to the case, or to either party, which will prevent him from acting impartially and without prejudice to the substantial rights of the party challenging." From this it will be seen that if any of the grand jurors were depositors in the bank, or from other cause had such a prejudice as would prevent them from acting impartially, the petitioners would have their remedy by motion to set aside the indictments upon arraignment in the district court, and not in this proceeding.

Among the cases holding that objections to grand jurors are limited to the grounds provided by statute are *Ex Parte Winston*, 9 Nev. 71; *In re Twohig*, 13 Nev. 302; *People* v. *Smith*, 118 Mich. 73; *Territory* v. *Hart*, 7 Mont. 42, 14 Pac. 768; *Johnson* v. *State*, 62 Ga. 179.

In *Keizo* v. *Henry*, 211 U. S. 146, 29 Sup. Ct. 41, 53 L. Ed. 125, the court said: "Unquestionably, if the trial court had exceeded its jurisdiction, a prisoner held under its judgment might be discharged from custody upon a writ of *habeas corpus* by another court having the authority to entertain the writ (*Ex Parte Lange*, 18 Wall. 163, 21 L. Ed. 872; *Ex Parte Siebold*, 100 U. S. 371, 25 L. Ed. 717; *Ex Parte Yarbrough*, 110 U. S. 651, 4 Sup. Ct. 152, 28 L. Ed. 274; *Ex Parte Wilson*, 114 U. S. 417, 5 Sup. Ct. 935, 29 L. Ed. 89), although even in a case of this kind a court

will sometimes refrain from releasing a prisoner upon writ of *habeas corpus*, and will remit him to his remedy by writ of error. (*Riggins* v. *United States*, 199 U. S. 547, 26 Sup. Ct. 147, 50 L. Ed. 303; *Urquhart* v. *Brown*, 205 U. S. 179, 27 Sup. Ct. 459, 51 L. Ed. 760.) But no court may properly release a prisoner under conviction and sentence of another court, unless for want of jurisdiction of the cause or person, or for some other matter rendering its proceedings void. Where a court has jurisdiction, mere errors which have been committed in the course of the proceedings cannot be corrected upon a writ of *habeas corpus*, which may not, in this manner, usurp the functions of a writ of error. (*Ex Parte Parks*, 93 U. S. 18, 23 L. Ed. 787; *Ex Parte Siebold*, 100 U. S. 375, 25 L. Ed. 717; *Ex Parte Yarbrough, supra; Ex Parte Wilson, supra; Re Delgado*, 140 U. S. 586, 11 Sup. Ct. 874, 35 L. Ed. 578; *United States* v. *Pridgeon*, 153 U. S. 48, 59, 63, 14 Sup. Ct. 746, 38 L. Ed. 631, 635, 637; *Andrews* v. *Swartz*, 156 U. S. 272, 276, 14 Sup. Ct. 389, 39 L. Ed. 422, 423; *Riggins* v. *United States, supra; Felts* v. *Murphy*, 201 U. S. 123, 26 Sup. Ct. 366, 50 L. Ed. 689; *Valentina* v. *Mercer*, 201 U. S. 131, 26 Sup. Ct. 368, 50 L. Ed. 693.)

"Disqualifications of grand jurors do not destroy the jurisdiction of the court in which an indictment is returned, if the court has jurisdiction of the cause and of the person, as the trial court had in this case. (*Ex Parte Harding*, 120 U. S. 782, 7 Sup. Ct. 780, 30 L. Ed. 824; *Re Wood*, 140 U. S. 278, 11 Sup. Ct. 738, 35 L. Ed. 505; *Re Wilson*, 140 U. S. 575, 11 Sup. Ct. 870, 35 L. Ed. 513.) See *Re Moran*, 203 U. S. 96, 104, 27 Sup. Ct. 25, 51 L. Ed. 105, 108. The indictment, though voidable, if the objection is seasonably taken, as it was in this case, is not void. (*United States* v. *Gale*, 109 U. S. 65, 3 Sup. Ct. 1, 27 L. Ed. 857.) The objection may be waived, if it is not made at all or delayed too long. This is but another form of saying that the indictment is a sufficient foundation for the jurisdiction of the court in which it is returned, if jurisdiction otherwise exists."

In *Allen* v. *Reilly*, 15 Nev. 455, it was said: "Defendant

then moved for a change of venue, on the ground that he could not have a fair and impartial trial before the judge presiding, because he and defendant had been, and then were, bitter personal enemies. The motion was supported by the defendant's affidavit setting out the facts just stated; but it was denied by the court. The judge was not disqualified under the statute. (Comp. Laws, 950.) It is held in California that bias or prejudice on the part of the judge, even in a criminal case, constitutes no legal incapacity to sit on the trial of a case, and is not sufficient ground to authorize a change of the place of trial. (*People* v. *Williams*, 24 Cal. 33.) And so it was held in a civil case (*McCauley* v. *Weller*, 12 Cal. 523). This is especially true when a jury finds the facts; for, if a court errs in matters of law, its errors may be corrected as effectually on appeal taken by an enemy as by a friend. Besides, the presumption is that the court will not be influenced by the animosities of the judge, if such he has."

An act of the legislature passed in 1895 (Stats. 1895, p. 64) provided that upon the filing of an affidavit of the prejudice of the district judge another judge should be called to try the case. This statute gave an opportunity for parties to avoid trial before a judge that they did not desire to have try the case for other reasons than bias; and it was repealed at the next session of the legislature. (Stats. 1897, p. 88.) Section 4865 of the Revised Laws provides that a judge shall not act in a case in which he is interested, or where he is related to one of the parties within certain degrees by blood or affinity. The law has more safeguards against the prejudice of jurors than against the bias of judges; for the errors of judges, relating to matters of law, are generally more easily corrected on review than the unjust action of jurors, caused by prejudice or undue feeling.

The framers of our constitution were careful to preserve the right of trial by a fair and impartial jury, and article 6, section 12 (Rev. Laws, 327), provides that "judges shall not charge juries in respect to matters of

fact." Under this section, verdicts of conviction have been uniformly set aside, where the judge expressed an opinion or intimated before the jury that the accused was guilty. Cases so holding are cited under section 327, Revised Laws. Verdicts have also been set aside because of the improper remarks of the district attorney, the officer selected to prosecute offenders, and who is not under the same solemn duty as the judge to hold the scales of justice impartially between the accused and the state. (*State* v. *Rodriguez*, 31 Nev. 342; *State* v. *Petty*, 32 Nev. 384.)

After such denunciation in public places, in court, in the public press, and at a public meeting by the highest judicial officer in the community, it is not probable that in the county, with a small population, any jury would be obtained without members who had heard, heard of, or been influenced by, the condemnation of the judge.

The reasons stated in some cases holding that the bias of the judge does not prevent him from acting, because his errors may be corrected on appeal, would seem to be good and sufficient in cases where the error can be detected and corrected on appeal. Whether there should be an exception to the rule in cases where the reason for it fails, or in matters where the judge acts upon his discretion in the selection of grand jurors, in regard to which it cannot be known whether any bias or feeling influenced the selection, and whether the bias of a judge may be so extreme in any case as to warrant the setting aside of an indictment, on the theory that the constitution, regardless of the lack of statutory provision, entitles the citizen to be released from it or a bench warrant under it, we need not determine, in view of the order which is to be made in this proceeding. It is the rule that constitutional questions will not be determined, unless their determination is necessary for a disposition of the case. (*Burling* v. *Goodman*, 1 Nev. 314; *State* v. *Meder*, 22 Nev. 264; *State* v. *Stoddard*, 25 Nev. 452, 51 L. R. A. 229; *State* v. *Curler*, 26 Nev. 347.)

The cases, having been argued and submitted together, and being so allied, have been determined together. The petitioners will stand discharged, and the clerk will make an order in each of the above-entitled cases accordingly.

### ON PETITION FOR REHEARING

*Per Curiam:*

Respondents have petitioned for a rehearing. The effect of granting a rehearing would be to suspend the former order discharging the petitioners. (3 Cyc. 219.) This would subject petitioners to rearrest upon the very charges upon which they have been discharged in violation of section 29 of the *habeas corpus* act. (Rev. Laws, 6254.) Under statutes like ours, the Supreme Court of California has held that there is no practice in that state allowing petitions for rehearing in cases of *habeas corpus*. (*Ex Parte Robinson*, 71 Cal. 608.) Except where there is statutory provision therefor, an order discharging a prisoner has generally been held not subject to review. (21 Cyc. 335, *et seq.*) It has been held that to allow a review of an order of another court made in a *habeas corpus* case is inconsistent with the object of the writ. (*Wyeth* v. *Richardson*, 10 Gray, 240; *Knowlton* v. *Baker*, 72 Me. 202; *State* v. *Miller*, 97 N. C. 451, 1 S. E. 776; *People* v. *Schuster*, 40 Cal. 627; *Grady* v. *Superior Court*, 64 Cal. 155, 30 Pac. 613; *In re Clasby*, 3 Utah, 183, 1 Pac. 852.)

The petition for a rehearing is denied.